**Dorcas BOND and Barbara Baldwin, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**William H. DENTZER, Individually and as Superintendent of the Banking Department of the State of New York, et al., Defendants.**

No. 70-CV-365.

United States District Court, N. D. New York.

July 25, 1973.

32. Affidavit of Paul O'Neill, Associate Director for Human and Community Affairs, Defendants' Exhibit B.

Lawrence F. Klepper, Chief Counsel, Legal Aid Society of Albany, Inc., Albany, N. Y., for plaintiffs; Joel F. Spitzer, Lawrence F. Klepper, Albany, N. Y., of counsel.

Louis J. Lefkowitz, Atty. Gen. of N. Y., Albany, N. Y., for defendant William H. Dentzer, Superintendent of the Banking Dept. of the State of N. Y.; John Q. Driscoll, Asst. Atty. Gen., of counsel.

DeGraff, Foy, Conway & Holt-Harris, Albany, N. Y., for defendant Beneficial Finance Co. of N. Y., Inc.; John T. DeGraff, Thomas F. Conneally, Jr., Harvey M. Lifset, Albany, N. Y., William H. Allen, Washington, D. C., Ralph D. Semerad, Albany, N. Y., of counsel.

Harvey M. Lifset, Albany, N. Y., for defendant Protective Loan Corp.

JAMES T. FOLEY, Chief Judge.

### OPINION—JUDGMENT—ORDER

### PART I—FACTS

The parties are in accord on the material facts in this case. Summary judgment is appropriate in such circumstances and the plaintiffs have filed a motion for the same. The defendants move to dismiss the complaint upon three stated grounds.

Plaintiffs Bond and Baldwin are of low-income and have been represented by the Legal Aid Society of Albany. They are each alleged to have owed amounts of under three hundred dollars to defendants, the Beneficial Finance Co. and the Protective Loan Corp. (hereafter 'finance companies'). Contained in the debt contracts of each plaintiff were 'wage assignment agreements' as authorized by the New York State Personal Property Law, Article 3–A entitled "Assignment of Earnings" (§§ 46–49), McKinney's Consol.Laws, c. 41. The source of this controversy is the claim by the finance companies that there is a legal debt in existence, that a default has occurred thereon, and that they are entitled under the statute and the wage assignment agreement to execute against the wages of plaintiffs. The plaintiffs' position is simply that they possess valid legal defenses to these debts, but cannot assert them under these statutes in a way that guarantees their rights of due process. The single issue presented in the instant litigation is whether the procedure provided for in the New York Assignment of Earnings statute is adequate for resolution of this controversy within the meaning of the Fourteenth Amendment's due process clause. While plaintiffs also base their claims on the equal protection clause, it is unnecessary to consider this issue since the holding of this court grants full relief on the due process issue. See Laprease v. Raymours Furniture Co., 315 F.Supp. 716, 724–725 (N.D.N.Y.1970) (three-judge court). Other claims in this case, upon which there is less than full agreement, relate to the compliance with the various procedures of this statute. But these are essentially questions of state law and are unnecessary to the constitutional question addressed by this case.

Four preliminary issues of procedure were presented originally in this case. They were:

1. Whether this action could proceed as a class action;

2. Whether the N. Y. Superintendent of Banking was a proper party, necessitating the convening of a three-judge court for review of this statute;

3. Whether this court has jurisdiction of the controversy under Title 42 U.S.C. § 1983; and

4. even if there is jurisdiction, whether this court should postpone or delay its exercise under the abstention doctrine.

By my previous decision, the motion by plaintiffs to convene a three-judge court was denied and the motion to dismiss insofar as the action is sought to be maintained as a class action was granted. See Bond v. Dentzer, 325 F.Supp. 1343, 1352 (N.D.N.Y.1971), petition for mandamus denied, Dk. No. 71–1467 (2d Cir. May 14, 1971). It is noteworthy at this juncture that subsequent to my previous decision the Supreme Court decided Lynch v. Household Finance, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), which expressly rejected the personal liberty-property doctrine of Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969) which I had discussed and followed in my *Bond* decision. See Lynch v. Household Finance, *supra*, 405 U.S. at 542, 92 S.Ct. 1113. The *Lynch* case along with the recent landmark case of Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), had been awaited to help in the resolution of the remaining issues of this case. The many subtle questions raised by these issues, some of which were alluded to and briefly discussed in my prior decision, have been answered by the Supreme Court in these and other recent cases, cited also in this decision.

PART II—JURISDICTION

■ Section 1983 of the Civil Rights Act provides a cause of action against:

*Every person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges; or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (emphasis supplied). This statute clearly draws no distinction whether the primary actor is a "state officer or agent" or a "private individual". "Every person" reasonably means *any* person, publicly or privately characterized. (emphasis supplied). See Adickes v. Kress & Co., 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Essentially, it is the nature of the act, not the person, which is the determinative factor in resting jurisdiction upon Section 1983. Civil Rights Cases, 109 U.S. 3, 54–60, 3 S.Ct. 18, 27 L.Ed. 835 (1883) (Harland, J. dissenting); see also Hall v. Garson, 430 F.2d 430, 439 n. 20 (5th Cir. 1970).

Of course, in circumstances where the constitutional deprivation is by an agent or officer of the state, there is usually no question that acts pursuant to that title are under color of state law. But this only means that acts performed by private individuals supported by the state will be a subtler form of state action under § 1983, but no less offensive for this reason if the result is constitutional deprivation. United States v. Price, 383 U.S. 787, 794–795, 86 S.Ct. 1152, 16 L.Ed. 2d 267 (1966).

■ There are two elements necessary to establish a cause of action under § 1983. The first element must establish that the plaintiff was deprived of a right secured by the Constitution; the second, that the defendant acted under color of law. Adickes v. Kress & Co.,

*supra*, 398 U.S. at 150, 90 S.Ct. 1598. For purposes of the following "state action" discussion herein, it will be assumed *arguendo*, that the deprivation of a constitutional right can be shown. (See Part IV, *infra*).

The variety of acts where a state can be involved in the deprivation of an individual's Constitutional rights is great. However, there have developed at least four generic patterns where state acts may be said to deprive a person of these rights:

A. Where the state acts through its own designated officers and agents.

B. Where the state becomes a 'silent partner' in unconstitutional acts or where it adopts private interests and acts as its own.

C. Where the state authorizes, encourages, or creates an atmosphere where private interests deprive individuals of their constitutional rights. This may take the form of state inaction, whereby private individuals acting with the blessing of the state can accomplish what the state could not do directly.

D. Where functions normally or traditionally performed by the state are delegated to or performed by private interests.

A. STATE OFFICER OR AGENT

■ By my previous decision [325 F.Supp. 1343, 1348–1349 (N.D.N.Y. 1971), petition for mandamus denied, Dk. No. 71–1467 (2d Cir. May 14, 1971)], the State Banking Superintendent was dismissed from this action as an improper party. Fed.R.Civ.Proc. 21; see also Committee for Public Education and Religious Liberty v. Rockefeller, 322 F.Supp. 678, 685–686 (S.D.N.Y.1971); Hernandez v. European Auto Collision, 346 F.Supp. 313, 316 (E.D.N.Y.1972), rev'd on other grounds, 487 F.2d 378, Dk. No. 406 (2d Cir. 1973); McCormick v. First National Bank of Miami, 322 F.Supp. 604, 608 (S.D.Fla.1971); Klim

v. Jones, 315 F.Supp. 109, 112–113 (N. D.Cal.1970); *Moody v. Flowers,* 387 U. S. 97, 102, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967); *Wilentz v. Sovereign Camp,* 306 U.S. 573, 579–580, 59 S.Ct. 709, 83 L.Ed. 994 (1939); compare, .*Barber v. Rader,* 350 F.Supp. 183, 186 (S.D.Fla.1972) (three-judge court) (per curiam). Thus no state official remains as a party-defendant and hence there is no "pure" state action in the sense previously discussed, and this case is inappropriate for the convening of a three-judge court.

Notwithstanding the absence of acts performed directly by the state through a designated agent, I do find that there is state action of the kind under principles "B–D" hereinafter discussed.

## B. PARTNERSHIP

*Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L. Ed.2d 45 (1961) provides the best example of the state becoming a silent business partner with private interests. In this case the "Eagle" restaurant, a privately owned concern, leased building and parking facilities from a state agency. The Court held that discrimination practiced by the Eagle was state action because:

> [t]he State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity . . .

*Id.,* at 725, 81 S.Ct. at 862.

There was a mutuality of economic interests and a coordinated effort to discriminate, i. e., the use by the restaurant of a public building and public parking-lot facilitated their "private" acts of discrimination. In *Adickes v. Kress & Co., supra,* 398 U.S. at 152, 90 S.Ct. 1598, the same principle is expressed in circumstances similar to *Burton.* There, a private interest linked with a state custom or policy was viewed as joint action that deprived persons of their constitutional rights, even though the private interest was the dominant actor. Similarly, under certain kinds of

state liquor license regulation private interests are given such economic advantages that they become business partners with the state in the regulation. *Bennett v. Dyer's Chop House, Inc.,* 350 F.Supp. 153, 154–155 (N.D.Ohio 1972); *Seidenberg v. McSorleys' Old Ale House, Inc.,* 317 F.Supp. 593, 603 (S.D.N.Y. 1970). The acts of the private interest in depriving persons of constitutional rights in these circumstances are the acts of the partnership and are attributable to the public or state interest, ergo, they are state action under § 1983. The recent holding in *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), to my mind is not inconsistent with this view. The Court there held that the facts did not show an economic mutuality that advanced the discriminatory acts of the private interest; hence no state action based on a "partnership" was formed. *Id.,* at 177, 92 S.Ct. 1965.

The judicial branch of state government may also be the silent partner, using its power to further the acts of private interests which deprive a person of constitutional rights. *Shelley v. Kraemer,* 334 U.S. 1, 19, 68 S.Ct. 836, 92 L. Ed. 1161 (1948); *Brinkerhoff-Faris Co. v. Hill,* 281 U.S. 673, 682, 50 S.Ct. 451, 74 L.Ed. 1107 (1930). Such procedures are most common to the creditor-debtor sphere of law where creditors, by virtue of their economic power have been allowed to circumvent some legal procedures. Most of these procedural shortcuts can only increase the power of the creditor vis à vis his debtor. The Court of Appeals, Second Circuit, recently made an observation that the:

> [a]ppellee, a finance company, is not a stranger to the coercive advantages provided by the confessed judgment device; undoubtedly, it is fully aware that the procedure allows a creditor to avoid formal, lengthy, and expensive legal proceedings in order to collect from his debtor, and that it is precisely for this reason that lenders use the confessed judgment.

Alland v. Consumer's Credit Corp., 476 F.2d 941, 957, Dk. No. 410 (2d Cir., 1973).

Many other short-cut judicial procedures have been condemned by both Federal and state courts through the nation. See Swarb v. Lennox, 314 F.Supp. 1091, 1095 (E.D.Pa.1970) (three-judge court), affirmed, 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); generally, Brown, A Meaningful Opportunity to be Heard, 46 St. John's L.Rev. 25, 25–26 (1971).

Article 3A of New York State's Personal Property Law creates a significant economic advantage for creditor finance companies through its wage assignment procedure. The loan companies are authorized by the pertinent sections to actually attach the wages of a person without any obligation to ever seek any sort of judicial determination, that a legal debt exists in fact and a default has occurred thereon, which justifies their action. Fuentes v. Shevin, 407 U.S. 67, 87 n. 17, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Laprease v. Raymours Furniture Co., 315 F.Supp. 716, 723 n. 9 (N. D.N.Y.1970) (three-judge court); Hernandez v. European Auto Collision, Inc., 487 F.2d 378, Dk. No. 406 (2d Cir. 1973); Logan v. Short, 342 F.Supp. 1349, 1352 n. 2 (E.D.Mo.1972). Under extremely particularized and narrow circumstances a compelling state interest may justify the abbreviation or elimination of important judicial procedures, but under the admitted facts here this certainly is not such a case. See Fuentes v. Shevin, supra, 407 U.S. at 90–93, 92 S.Ct. 1983.

█ The wage assignment statute challenged merges, in my judgment, state power and private economic interests to permit the taking of a percentage of the wages of gainful employment without any opportunity for a judge to hear each side of the controversy *before* taking of portions of wages in any respect. The state delegates the power allowing finance companies to proceed without any judicial interposition and in this sense, in my judgment, there is the same mutuality of economic interest or similarity of purpose that was found and condemned in *Burton* and *Adickes*, and thus qualifies as state action under § 1983. *Cf.* Lynch v. Household Finance Corp., 405 U.S. 538, 553–556, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972).

## C. ENCOURAGEMENT

The fact that the state statutory wage assignments aid finance companies economically is certainly encouragement in itself. But even beyond this factor, the statutory scheme commands the procedures that result in the deprivation of substantial rights of persons by private interests. See N.Y.Pers.Prop.L. § 46–b.

█ To create this type of atmosphere, the state need not take an affirmative role in the acts depriving another of constitutional rights; it is enough that the consequences of state "neutrality" allow private interests to do so. Reitman v. Mulkey, 387 U.S. 369, 381, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); see also, *Id.*, at 381 et seq., 87 S.Ct. 1627 (Douglas, J., concurring). The lesson of *Reitman* is that state policy is not necessarily what the state law says it is, rather what the policy *de facto* is found to be. Accordingly, the Supreme Court chose the findings of fact by the California Supreme Court instead of the state constitutional declaration of state neutrality and non-involvement in private discrimination, when it affirmed the California Supreme Court's finding that the state policy in fact was not "neutral" but rather encouraged unconstitutional discrimination. *Id.*, at 381, 87 S.Ct. 1627.

The wage assignment statute of New York presents a much less hidden "state encouragement" because it "is not just action against a backdrop of an amorphous state policy, but instead action encouraged, indeed only made possible, by explicit state authorization". Klim v. Jones, *supra*, 315 F.Supp. at 114 (N.D. Cal.1970); see also Barber v. Rader, *su-*

*pra,* 350 F.Supp. at 189 (S.D.Fla.1972) (per curiam) (three-judge court). The atmosphere created by the New York wage assignment scheme encourages the finance companies to take unilateral, non-judicial action and compels the debtor, usually of low income, to capitulate to these pressures "waiving" certain rights to get the needed loan (see Part IV C, *infra*) and signing away the right to judicial intervention against the finance company's action, no matter the presence of valid defense or dispute.

New York's statute makes these wage assignment agreements so advantageous to the finance companies that they are contracts of adhesion as far as these plaintiffs are concerned in the light of the several recent Supreme Court analyses in similar situations. Indeed, this is virtually conceded by defendants. (Defendants' Supplemental Memorandum, p. 6). Under these circumstances, it becomes easy for finance companies to obtain such agreements from debtor-clients. Fuentes v. Shevin, *supra,* 407 U.S. at 83 n. 13, 92 S.Ct. 1983, 32 L.Ed. 2d 556; Alland v. Consumers Credit Corp., *supra,* 476 F.2d at 956. In general, finance companies can use these advantageous legal procedures to increase the already disproportionate balance of bargaining power and to coerce the debtor into "refinancing" his loan, or into not asserting what might be a meritorious defense against the debt, or other such acts not in the debtor's interest. Sniadach v. Family Finance Corp., *supra,* 395 U.S. at 341, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); see, Note, Protecting the Low-Income Consumer: Procedural Due Process Revisited, 14 William & Mary L.Rev. 337 (1972). The attractiveness and singularity of the statutory wage assignment procedure induces uniformity among the finance companies to use virtually identical wage assignment agreements. Pers.Prop.L. § 46–b. This severely reduces a debtor's options in the small loan market especially if he is in need of a loan and must use his wages as collateral, because it is doubtful he could find a finance company that

would negotiate for different procedures other than the assignment. Adams v. Egley, 338 F.Supp. 614, 620–621 (S.D. Cal.1972); Santiago v. McElroy, 319 F. Supp. 284, 294 (E.D.Pa.1970) (three-judge court). As the finance companies are encouraged to use this procedure, there are also forces which discourage the assignor-debtor from challenging any actions of the finance company in court. For example, while section 47–e provides for a special proceeding to vacate a wage assignment prior to its execution, a close review of the statute and cases interpreting it convince me that this procedure may not be employed in a defense going to substance, e. g., challenging the validity of the debt itself. See Cajuste v. Budget Credit, 5 Misc.2d 948, 162 N.Y.S.2d 748 (1957); Fuentes v. Shevin, *supra,* 407 U.S. at 97, 92 S.Ct. 1983, 32 L.Ed.2d 556, and Holt v. Brown, 336 F.Supp. 2, 6 (W.D.Ky.1971). So even assuming that a low-income assignor was aware of this proceeding and could obtain counsel in time to stop the taking of his wages, there is great doubt that he could obtain a meaningful review which would include all of his defenses.

Yet another serious shortcoming of these statutes is that they effect a reversal in the burden of proof. Instead of the finance company having to initiate action and prove that there is a debt and that there has been a default thereon, the debtor must initiate the action to prove the invalidity of the debt. Given the relative economic power and legal resources of these parties, this anomaly has a particularly harsh effect upon the debtor. See *infra,* Part IV, A and B.

■ The foregoing observations convince me that the state has nurtured and encouraged the policy and acts of finance companies to demand wage assignments from such persons as plaintiffs herein. The state delegates the power to the finance company to unilaterally decide when a debt exists and default occurs. It denies the debtor, in my judgment, an effective and realistic way to challenge that determination before the

company can take the wages. Laprease v. Raymours Furniture Co., *supra*, 315 F.Supp. at 723; Hernandez v. European Auto Collision, Inc., *supra*, 487 F.2d at 483, n. 1.

### D. TRADITIONAL STATE FUNCTIONS

Under this theory courts have held that where a private individual is performing a function pursuant to a right accorded by statute, where that function is traditionally performed by the state, those acts of the individual may be described as state action. Hernandez v. European Auto Collision, *supra*, 346 F. Supp. at 317 n. 4; Hall v. Garson, *supra*, 430 F.2d at 438–439; Palmer v. Columbia Gas Co. of Ohio, 342 F.Supp. 241, 246 (N.D.Ohio 1972).

■ Under our law the debtors are entitled to have the creditor prove the debt and the default of its terms. See *infra*, Part IV, B. Proof may be an *ex parte* or a full adversary hearing, but both must involve review by a judicial officer as an element. Laprease v. Raymours Furniture Co., *supra*. Since the need for a court to render a judgment and for a sheriff or other official to execute it is obviated and instead left to the company to accomplish, the law can be said to delegate a traditional state function to a private interest.

### PART III—ABSTENTION

■ Defendants urge this court to postpone the exercise of its jurisdiction pending litigation in the state courts, arguing that this case falls within the abstention doctrine. The principal thrust of their argument is that the questions presented by this case have never been addressed by the New York Court of Appeals, the state's highest court. But the abstention doctrine has never been based on such a proposition. Zwickler v. Koota, 389 U.S. 241, 251, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Harman v. Forssenius, 380 U.S. 528, 534–537, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Meredith v. Winter Haven, 320 U.S. 228, 234–235, 64 S.Ct. 7, 88 L.Ed. 9 (1943). The doctrine is simply not that broad.

The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest.

Allegheny County v. Mashuda Co., 360 U.S. 185, 188–189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959). Where jurisdiction is proper in both state and federal courts, it is the duty of both to address the complaint where the plaintiff chooses to have it heard. McNeese v. Board of Education, 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963). Furthermore, there is a special duty upon federal courts to exercise their jurisdiction in civil rights cases because abstention is least appropriate where federal civil rights are in jeopardy. Holmes v. New York City Housing Authority, 398 F.2d 262, 265–266 (2d Cir. 1968); Wright v. McMann, 387 F.2d 519, 525 (2d Cir. 1967); Owens v. Parham, 350 F.Supp. 598, 600 (N.D.Ga.1972) (three-judge court); Musselman v. Spies, 343 F. Supp. 528, 533 (M.D.Pa.1972) (three-judge court); Holt v. Brown, 336 F. Supp. 2, 5 (W.D.Ky.1971) (three-judge court); Santiago v. McElroy, 319 F. Supp. 284, 292 (E.D.Pa.1970) (three-judge court). Abstention is not a doctrine that defers to state courts, preserving comity by causing additional hardship for the parties, especially the plaintiff. Rather, it is a rule of discretion to be exercised when the district court believes that some asset particular to the state's courts jurisdiction will most likely aid in adjudicating the merits of the litigation, Railroad Comm'n. v. Pullman Co., 312 U.S. 496, 500–501, 61 S.Ct. 643, 85 L.Ed. 971 (1941); or

where the nature of the state court's particular assistance to the litigation might be in providing a necessary background to understanding the significance of the issues to the state itself. Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970); Kaiser Steel Corp. v. W. S. Ranch, 391 U.S. 593, 88 S.Ct. 1753, 20 L.Ed.2d 835 (1968) (per curiam). In either situation, the enhanced likelihood of a more informed adjudication, still preserving a day in federal court, justifies the accompanying delay of abstention. Both *Reetz* and *Kaiser Steel* were controversies involving natural resources important to the very survival of two states, fish in Alaskan waters and water in arid New Mexico. It was thought wiser to allow the state courts to attempt to resolve the issues under state law, consistent with the federal constitution, before a federal court pre-empted this opportunity with perhaps a less informed or less sensitive solution. Wisconsin v. Constantineau, 400 U.S. 433, 438, 91 S.Ct. 507, 27 L. Ed.2d 515 (1971); see also, Holmes v. New York City Housing Authority, *supra,* 398 F.2d at 266–267.

■ Since state courts will presumably be bound by and thus apply the federal constitution, abstention is sometimes a matter of allowing the state courts to construe their own statutes in a manner that will be consistent with the federal constitution. In cases of a genuinely ambiguous statute this will preserve both the constitutional rights of plaintiff and the operation of the state statute. But where the state statute is unambiguous and does not need an authoritative state court decision to be understood, there is then no reason to postpone or deny plaintiff his right to relief in a federal court established by Congress for this very purpose.

New York's wage assignment statute does not provide, as I read and analyze it, for a meaningful hearing before the execution against wages. There is no ambiguity present in my judgment and, therefore, under compelling case law of

the highest federal judicial authority, no justification to abstain. Wisconsin v. Constantineau, *supra,* 400 U.S. at 439, 91 S.Ct. 507; Snead v. Dept. of Social Services, City of New York, 355 F.Supp. 764 (S.D.N.Y.1973) (three-judge court), appeal filed, 41 U.S.L.W. 3659 (June 11, 1973).

■ Abstention may sometimes be justified if a federal court order might seriously disrupt the operation of state government, Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 329, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964). However, since there is no state officer as a party defendant in this action, there is no such consideration. See *supra,* Part II, A; Allegheny County v. Mashuda Co., *supra,* 360 U.S. at 189–190, 79 S.Ct. 1060. Indeed, there can be no effect upon state operations at all since the wage assignment statute is largely a self-help measure aiding in the collection efforts of the finance companies. Meredith v. Winter Haven, *supra,* 320 U.S. at 237, 64 S.Ct. 7, 88 L.Ed. 9; Rakes v. Coleman, 359 F.Supp. 370 (E.D.Va.1973).

■ Lastly, two aspects of the case at bar make it especially inappropriate for the withholding of jurisdiction. First, there is substantial doubt that New York provides an adequate remedy to plaintiffs which would be sufficient to prevent the wage attachment. See *infra,* Part IV, C(1); McNeese v. Board of Education, *supra,* 373 U.S. at 674–676, 83 S.Ct. 1433, 10 L.Ed.2d 622; Hillsborough v. Cromwell, 326 U.S. 620, 628, 66 S.Ct. 445, 90 L.Ed. 358 (1946). The mere similarity of due process rights in both federal and state constitutions does not affect this "doubtfulness" sufficiently to justify abstention. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Committee for Public Education and Religious Liberty v. Levitt, 342 F.Supp. 439, 442 (S.D.N.Y.1972) (three-judge court).

■ Second, abstention is within the equitable discretion of the district court. The decision on abstention may properly

consider hardships to plaintiffs resulting from the delay and expense of beginning again in state court, or other such factors. Allegheny County v. Mashuda Co., *supra*, 360 U.S. at 196–197, 79 S.Ct. 1060; Meredith v. Winter Haven, *supra*, 320 U.S. at 237, 64 S.Ct. 7; Holmes v. New York City Housing Authority, *supra*, 398 F.2d at 268. Accordingly, I believe plaintiffs in this case, being of low-income and represented by Legal Aid, would be put to excessive hardship should this court refuse to take jurisdiction. Therefore, I have come to the conclusion, upon further reflection and in view of the clarity in recent Supreme Court decisions, that abstention, in effect to stand by and await state court rulings, should not be invoked.

## PART IV—MERITS

### A. DUE PROCESS

 It is well settled law that where the state is involved in any deprivation of a property interest, whether temporary or permanent, contingent or final, there is a:

> duty of government to follow a fair process of decisionmaking . . . to protect against arbitrary deprivation of property. For when a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented. It has long been recognized that "fairness can rarely be obtained by secret, one-sided determination of facts decisive or rights. . ."

Fuentes v. Shevin, 407 U.S. 67, 80–81, 92 S.Ct. 1983, 1994 (1972).

It must be emphasized that the *Fuentes* case addressed itself primarily to the property interest in the "continued use of the goods", and indicated that this right is separate from the determinations of the right to ultimate possession or ownership. Hernandez v. European Auto Collision, Inc., 487 F.2d 378, 385, Dk. No. 406 (2d Cir., 1973) (Timbers, J., joined by Lumbard, J., concurring); Mason v.

Garris, 360 F.Supp. 420 (N.D.Ga., 1973); Straley v. Gassaway Motor Co., Inc., 359 F.Supp. 902 (S.W.D.Va., 1973). Therefore, whether defendants in the instant action will ultimately be entitled to execute their wage assignment against the plaintiffs or not, there is no question that the plaintiffs have a right to the continued use of their wages in the same way as declared in *Fuentes*. The legal import of an "assignment" of wages might be the transfer of title or equitable ownership in the wages to defendants, in effect similar to the terms of the sales contract in *Fuentes*. But even so plaintiffs here are still entitled to the retention and continued use of their wages as Mrs. Fuentes was entitled to continued possession and use of her property. It is this right which the Supreme Court protected by mandating that it be accorded a meaningful notice and hearing prior to any taking involving the state or its laws. Without such procedures the chances for exploitation, harassment and plain mistake are enormously greater. See e.g., Bronson v. Consolidated Edison Co. of New York, Inc., 350 F. Supp. 443 (S.D.N.Y.1972).

The safeguards inherent in a judicial hearing take an added importance when the victims of potential abuse are persons of low income who are generally unknowledgeable of even ordinary legal procedures. Alland v. Consumers Credit Corp., 476 F.2d 951, 956 (2d Cir., 1973). The mystery of such subtle legal procedures as wage assignments can often envelop persons of low income in a "credit nightmare"—unable to vindicate their rights. For a low income person, wages might be the only valuable asset that could be used to secure a small loan. Thus the taking of a person's wages in light of these pressures "may as a practical matter drive a wage-earning family to the wall." Sniadach v. Family Finance Corp., 395 U.S. 337, 341–342, 89 S.Ct. 1820, 1822–1823, 23 L.Ed.2d 349 (1969). This leverage unfortunately has been used by some finance companies to "refinance", i. e., increase, the obligations of their debtors or to otherwise increase

their leverage. Note, Protecting the Low Income Consumer; Procedural Due Process Revisited, 14 William & Mary L.Rev. 337, 341 (1972).

■ Pressures upon the wage assignment debtor not only emanate from the creditor-finance company, but also from the debtor's employer who becomes saddled with the administration of the wage assignment. Indeed, the service of the wage assignment upon the employer, even without any prior judicial review or ratification, makes the employer subject to legal liability for any failure to administer the assignment. New York Personal Property Law § 48–a and 46–b; Continental Purchasing Co. v. Van Raalte Co., 251 App.Div. 151, 295 N.Y.S. 867 (4th Dept. 1937). And even if the debtor is dismissed or resigns from the employ of this job and takes another from a different employer, the assignment can easily follow him after a very simple refiling procedure. N.Y.Pers. Prop.L. § 48–c. In cases where the debtor holds an expendable or marginal job, these pressures mitigate against retaining or hiring him as an employee because of his personal debt problems. Note, Wage Garnishment in New York State: Practical Problems of the Employer, 34 Albany L.Rev. 395, 411–418 (1970). New York State has recognized this problem, at least in terms of "income executions" (N.Y.CPLR § 5231) and has prohibited the dismissal of employees for such reasons. Siegel, Practice Commentary; N.Y.CPLR § 5252 (Supp.). But there is no statutory amelioration of the similar pressures resulting from a wage assignment. New York's wage assignment statute thus leaves the assignor, already reluctant to defend himself because of the inherent economic realities, at the mercy of the unilateral decision of his finance company to take a portion of his wages. Laprease v. Raymours Furniture Co., 315 F.Supp. 716, 722 (N.D.N.Y.1970) (three-judge court).

■ The specific procedures that are necessary to satisfy due process may vary widely with the needs of the parties and the surrounding circumstances.

Burton v. Wilmington Parking Authority, 365 U.S. 715, 725–726, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). However, the fundamental concepts are the same no matter what specific procedures are mandated. It is the notion that society:

> must recognize a moral obligation to see that disputes are resolved on the basis of their merits rather than on the basis of the relative power of the contestants.

B. Christensen, Lawyers for People of Moderate Means 79 (1970), *cited in* Brown, A Meaningful Opportunity to be Heard, 46 St. John's L.Rev. 25, 25 (1971).

At the least this means that a neutral magistrate should listen to both sides of the dispute before either party is authorized by state law to take the other's property. And the absence of this fundamental procedure to my mind is precisely the failing of the wage assignment statute. It tacitly allows finance companies to unilaterally determine that a default by the debtor has occurred. Moreover, this decision is safe from review by any judicial or other neutral party except insofar as the debtor might be knowledgeable and resourceful enough to seek meaningful review in a court. This is the problem addressed by the Supreme Court in *Fuentes*:

> The statutes, moreover, abdicate effective state control over state power. Private parties, serving their own private advantage, may unilaterally invoke state power to replevy goods from another. No state official participates in the decision to seek a writ; no state official reviews the basis for the claim to repossession; and no state official evaluates the need for immediate seizure. There is not even a requirement that the plaintiff provide any information to the court on these matters. The State acts largely in the dark.

Fuentes v. Shevin, *supra*, 407 U.S. at 93, 92 S.Ct. at 2001.

This was also of central concern in Lynch v. Household Finance Corp., 405 U.S.

538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972):

> The garnished property is secured, not under the authority of the court, but merely in the hands of the garnishee \* \* \* Prejudgment garnishment is thus levied and maintained without the participation of the state courts . . . . Garnishment *might* serve to make a *subsequent* judgment effective \* \* \* But the garnishment was, in this case, an action taken by private parties who were not proceeding under a court's supervision and who were using, as agents, state officials who were themselves not acting pursuant to a court order or under a court's authority. (emphasis in original).

Id., at 554, 92 S.Ct. at 1123.

There can be no doubt that the power to determine and declare a default is crucial, for it underlies and presumes the legality of the wage assignment itself. N.Y.Pers.Prop.L. § 48. Perhaps more important is the fact that if a court proceeding was mandated, the finance company would have to show at least that a debt existed and a default had in fact occurred; and the fact that a person has fallen behind or has failed to make payments does not obviate the need for a hearing. Fuentes v. Shevin, *supra*, 407 U.S. at 87 n. 17, 92 S.Ct. 1983, 32 L.Ed.2d 556; Snead v. Dept. of Social Services of City of New York, 355 F.Supp. 764 (S.D.N.Y.1973) (three-judge court), appeal filed, 41 U.S.L.W. 3659 (June 11, 1973); see Part II, B, *supra*.

 The issue of default is one that requires an adversary hearing. The New York wage assignment statute challenged is unconstitutional for its failure to provide for a hearing on this issue prior to authorizing execution against a person's wages by the finance company, as required by the due process clause of the Fourteenth Amendment.

**B**

The defendants raise three arguments against this conclusion, but none of them affect this holding or the precedents underlying it. Defendants argue that:

1. The New York Personal Property Law does provide for a hearing by special proceeding under Pers. Prop. L. § 47–e.
2. Wage assignments were recognized at common law and the New York statutes at issue here are simply a codification of the common law.
3. The assignor-debtor was a free agent who contractually agreed to this procedure, and therefore waives any constitutional rights to object thereafter.

**1. HEARINGS**

 In cases of the deprivation of any property interest involving the state, either a hearing must be provided for both parties of a type that can realistically and actually prevent the initial deprivation; or if the rationale for some type of *ex parte* procedure exists then "at least that the creditor present to a judicial officer the circumstances allegedly justifying summary action." Laprease v. Raymours Furniture Co., *supra*, 315 F.Supp. at 724. The New York wage assignment statute satisfies neither of these requirements. Under some circumstances, it has been ruled that there is justification for *ex parte* procedure, see Fuentes v. Shevin, *supra*, 407 U.S. at 90–93, 92 S.Ct. 1983, 32 L.Ed.2d 556; Geisinger v. Voss, 352 F. Supp. 104, 109–111 (E.D.Wis.1972), but the instant wage assignment law provides for no such procedure generally. In terms of an adversary hearing, the only kind that are contemplated by these statutes are a special proceeding to vacate the assignment [§ 47–e] and a full plenary civil suit, both of which occur only upon the initiation of the debtor. Neither of these procedures in these circumstances, in my judgment, satisfy due process; the former is too little and the latter too late to prevent the initial deprivation.

It is sufficiently doubtful that all essential elements of the controversy, in-

cluding the legal validity of the debt, can be heard at a special proceeding under § 47–e. Cajuste v. Budget Credit, Inc., *supra*. This uncertainty makes the procedure constitutionally unsatisfactory. Bell v. Burson, 402 U.S. 535, 542–543, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); see also Brinkerhoff-Faris Co. v. Hill, 281 U.S. 673, 50 S.Ct. 451, 74 L. Ed. 1107 (1930); Bronson v. Consolidated Edison Co. of New York, Inc., *supra*, 350 F.Supp. at 449. And the fact that these issues could be litigated in a full civil suit, which is not quick enough to prevent the deprivation, is immaterial to the due process claim made here. Fuentes v. Shevin, *supra*. However, even beyond the inadequacies of these hearings, making it incumbent upon the debtor to challenge the seizure of his already marginal wages merely serves to further diminish his ability to defend himself against the greater power of the finance company. It places the burden of going forward with a challenge to the wage assignment upon the assignor. This gives at least a presumption of validity to the actions of the finance company against both the debtor and his employer. It is unrealistic to believe that most people of low income who have legitimate defenses will be able to assert them under such pressures. Fuentes v. Shevin, *supra*, 407 U.S. at 83, n. 13, 92 S.Ct. 1983, 32 L.Ed.2d 556. A statute should not leave a person in the awkward position of defending his property in court before another has even approached a court to legally claim it, especially when he has very little property and questionable legal resources to defend it adequately against the likes of corporate claimants who are in the business and quite familiar with such matters. Hernandez v. European Auto Collision, Inc., *supra*, 487 F.2d at 378, Dk. No. 406.

### 2. COMMON LAW

While it is true that assignment procedures were known to common law, its history bears little resemblance to the present statutes. And with specific reference to "voluntary assignments for the benefit of creditors", it can be said that they were in many respects peculiar to American common law and that they received their greatest development here during the industrialization of our economy with its credit expansion in the latter part of the nineteenth century. A. Burrill, A Treatise of Voluntary Assignments for the Benefit of Creditors 5 (3rd ed. 1882); R. Headley, The Law of Voluntary Assignments for the Benefit of Creditors under the New York Statutes, (Preface) (1896). Assignments have been frowned upon in English common law because of their great potential to conceal fraud. Thus in the American development, particularly early codifications, there was clearly a great concern to temporize the common law procedures with liberal judicial supervision. This supervision usually included hearings where all parties having any interest were notified and heard by a court before significant action could be taken by any party on an assignment. J. Bishop, Insolvent Debtors and the Law of Voluntary Assignment (Treatise) 111 et seq.; R. Headley, *supra*, at 7 and 17. But there is really no need to detail all of the changes occurring to the common law. Common law or codification of it may be overly harsh when viewed in the light of the Constitution. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); Santiago v. McElroy, *supra*, 319 F.Supp. at 295; Klim v. Jones, *supra*, 315 F.Supp. at 120–121; Shaffer v. Holbrook, 346 F.Supp. 762 (S.D.W.Va.1972). However, the comparison is useful to make clear the reason why the New York wage assignment statute fails to satisfy due process. The debt contract is one of the oldest forms of action in recorded common law and underlies the principle of "consideration" in contracts. The most fundamental element of every debt contract action in common law was an affirmative showing of the existence of the debt by the creditor before a magistrate. A satisfactory showing of the debt involved proof beyond general allegation of the debt. To wit:

> [i]t was characteristic of the German procedure that the defendant [debtor]

could meet that complaint by answering, in equally general form, that he did not owe the plaintiff. The plaintiff had to do more than simply allege a debt, if he would prevent the defendant from escaping in that way. In England, if the plaintiff had not something to show for his debt, the defendant's denial turned him out of court; and even if he had, he was liable to be defeated by the defendant's swearing with some of his friends to back him up that he owed nothing.

O. W. Holmes, The Common Law, 199. (Howe ed., 1963).

Under some circumstances common law did countenance some prejudgment deprivations of property, but as the Supreme Court has recently observed:

> on the occasions when the common law did allow prejudgment seizure by state power, it provided some kind of notice and opportunity to be heard to. the party then in possession of the property, and a state official made at least a summary determination of the relative rights of the disputing parties before stepping into the dispute and taking goods from one of them.

Fuentes v. Shevin, *supra*, 407 U.S. at 79–80, 92 S.Ct. at 1993–1994.

The New York statutes however countenance a legal procedure that can be set in motion by one party depriving another of his property without a court or state official ever being aware of it. Neither the Constitution, common-law or common sense ratify this type of procedure. Peak v. United States, 353 U.S. 43, 46, 77 S.Ct. 613, 1 L.Ed.2d 631 (1957). American tradition and fundamental due process have always assumed that there are at least two sides to every story. Anti-Fascist Committee v. McGrath, 341 U.S. 123, 160–165, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J. concurring). New York's wage assignment law makes it quite possible that one side will not be heard because of their unnecessary forfeiture of constitutional rights.

### 3. WAIVER

The final question of whether plaintiffs waive any constitutional rights needs very little discussion in light of *Fuentes*. The defendants all but admit that the wage assignment agreements are adhesion contracts (Defendants' Supplemental Memorandum at p. 6). The subject of waiver under similar circumstances has been extensively discussed in *Fuentes, supra*, 407 U.S. at 94–96, 92 S.Ct. 1983, 32 L.Ed.2d 556, and when contrasted to a factual situation where a proper contractual waiver was made [see D. H. Overmyer Co. v. Frick Co., 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972)], it leaves little doubt that plaintiffs in the instant case did not have the capacity to waive any rights under the wage assignment agreements. However, having perused the wage assignment agreements of both defendants, this court has been unable to discover any language, explicit or implicit, purporting to be a waiver of the right of debtors to have creditors prove at least that there is a debt and a default thereon. This is certainly a more serious flaw:

> [f]or a waiver of constitutional rights in any context must, at the very *least*, be clear. We need not concern ourselves with the involuntariness or unintelligence of a waiver when the contractual language relied upon does not, on its face, even amount to a waiver . . . . The contracts included nothing about the waiver of a prior hearing. They did not indicate *how* or *through what process*—a final judgment, self-help, prejudgment replevin with a prior hearing, or prejudgment replevin without a prior hearing—the seller could take back the goods. Rather, the purported waiver provisions here are no more than a statement of the seller's right to repossession upon the occurrence of certain events. The appellees do not suggest that these provisions waived the appellants' right to a full post-seizure hearing to determine whether those events had in fact occurred and

to consider any other available defenses. By the same token, the language of the purported waiver provisions did not waive the appellants' constitutional right to a preseizure hearing of some kind. (emphasis in original). *Fuentes v. Shevin, supra,* 407 U.S. at 95–96, 92 S.Ct. at 2002; *see also,* Swarb v. Lennox, 405 U.S. 191, 201, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972); compare, D. H. Overmeyer Co. v. Frick Co., *supra,* 405 U. S. at 188, 92 S.Ct. 775, 31 L.Ed.2d 124. This is precisely the case here. Defendants' wage assignment agreements do not even purport to waive a hearing on default or to waive any defenses to the fundamental validity of the debt, much less to qualify as a waiver under the Constitution. I find no grounds in law or fact to seriously argue that there has been a waiver. The assignor only agrees to give his wages as collateral *if there is a default.* This does not include allowing the company to unilaterally and presumptively declare default. Santiago v. McElroy, *supra,* 319 F.Supp. at 294; Hernandez v. European Auto Collision, *supra,* 487 F.2d at 383, Dk. No. 406. In a very recent ruling, Judge Gignoux applied the *Fuentes* reasoning to declare Maine Laws that permit prejudgment attachment of real estate without prior notice and hearing violative of the Due Process Clause of the Fourteenth Amendment and unenforceable. Lake Arrowhead Estates Inc. v. Cumming, 360 F. Supp. 1085 (D.C.D. Maine, S.D.1973).

PART V—CONCLUSION and ORDER

The history of our liberty has been in large measure, a history of procedure. It is an ancient principle evolved from the common law and consistently re-affirmed by the Supreme Court, that access to a court of law promotes the rule of law instead of a rule by force. The potential abuse in situations where one person claims the property of another, especially when the economic advantages favor one side, is greatly reduced when both sides can be brought before a court to present the merits of their position. It is always preferable to determine the merits prior to a taking and to thereafter allow the taking of property to proceed under the supervision and by written order of a court, rather than to statutorily authorize a party in interest to take the property unfettered by even an *ex parte* review by a court.

With this in mind, the following order is not meant to affect the legal device of the wage assignment *per se.* As previously mentioned, this type of collateral might well be the only security a person of low income might have to obtain a loan. Its assistance in encouraging finance companies to grant loans is not intended to be hampered by this decision, except as restricted herein, nor is this ruling meant to unduly burden the finance companies with a costly or delaying procedure. Indeed, if there is no merit to a debtor's position, it should not take very long to demonstrate this fact to a court. Lastly, and equally important, this decision is not meant to dictate what I think New York State should do in providing for a meaningful hearing with adequate notice to all interested parties. As the Supreme Court said in *Fuentes*:

[t]he nature and form of such prior hearings, moreover, are legitimately open to many potential variations and are subject, at this point, for legislation—not adjudication.

Fuentes v. Shevin, 407 U.S. 67, 96–97, 92 S.Ct. 1983, 2002, 32 L.Ed.2d 556 (1972); see also, Bell v. Burson, 402 U. S. 535, 542–543, 91 S.Ct. 1586, 29 L.Ed. 2d 90 (1971).

For these reasons, the cross-motion of the plaintiffs for summary judgment is granted and shall enter in their favor to the following extent:

1. The provisions of the New York Personal Property Law—Article 3A entitled "Assignment of Earnings", Sections 46 to 49, which permit the attachment of wages without an order of a judge or court of competent jurisdiction are hereby declared unconstitutional on their face and as applied insofar as they provide for execution against wages by

service of wage assignments on employers without actual notice and an opportunity to be heard being accorded the assignor and are declared in those respects as violative of the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

2. The defendants are enjoined and restrained from implementing or enforcing said provisions and procedures of Article 3A to enforce their wage assignment agreements against these plaintiffs unless an order of a court or judge is first obtained. See Laprease v. Raymours Furniture Co., *supra*, 315 F.Supp. at 725.

The motion of the defendants to dismiss the complaint upon stated grounds is denied and dismissed.

It is so ordered.