In the Matter of the Claim of ADELAIDE JONES, Appellant. PETER PAN NURSERY PRODUCTS, INC., Respondent; MARTIN P. CATHERWOOD, as Industrial Commissioner, Respondent.

Third Department, September 18, 1963.

*Mary B. Tarcher* and *David L. Tecklin* for appellant.

*Louis J. Lefkowitz, Attorney-General* (*Bernard Burdick, Paxton Blair* and *Samuel Stern* of counsel), for Industrial Commissioner, respondent..

BERGAN, P. J.   Claimant was employed as a packer in the employer's nursery pad business at a wage of $49 a week.  She owed the United States $140.40 for unpaid incomes taxes.   On August 28, 1961 a levy was issued by the District Director of Internal Revenue and served on the employer " directing it to withhold and turn over all of claimant's accrued wages."

The Unemployment Insurance Appeal Board has found that when the employer communicated with the Internal Revenue Service it was advised that " it would be necessary to withhold her entire wages until the entire delinquency was satisfied." The board found that the employer then told the claimant that it " would  *  *  *  withhold all of her earnings " until her indebtedness was fully paid.  " Claimant thereupon quit " the board found.

The issue in this case is whether she quit with good cause within section 593 (subd. 1, par. [a]) of the Unemployment Insurance Law (Labor Law, art. 18).   The board held this was not good cause.  We take another view.  As the case reaches us it is posed by both claimant and the Industrial Commissioner as a question of law; there is no dispute of fact.  Although the reasons stated by claimant in her report and in her claim included other grounds for termination, one that the employer itself

terminated her employment and another that she had personal reasons for leaving, these reasons were expressly rejected by the Referee who found as a fact that "She knew she quit because of the tax levy and the employer's intent to withhold her wages to pay the levy in full."

This factual finding not only was not disturbed by the Appeal Board in reversing the Referee, but its own finding is to the same effect. Indeed this is the report of the employer to the Department of Labor. "When we notified employee to the effect that all monies earned would have to be sent to the Internal Revenue Service until the lien was satisfied, she left our employ." The employer also reported that although it had attempted to arrange with the Internal Revenue Service to take out of her wages "a specified amount each week" that "they were adamant in their refusal."

The problem is, whether confronted with a decision of the employer to withhold all her future wages until the lien of the tax claim was satisfied, claimant quit her employment with just cause. Unless there was lawful authority for a levy upon all her future wages in these circumstances and for the announced decision of the employer to withhold all her future wages, it is not easy to see what alternative she had. It is not reasonably to be expected that a worker is to continue to provide the necessities of life without the benefit of any of the wages he earns, even though the indebtedness upon which the wages are all taken is entirely just and incurred through the fault or neglect of the worker himself. No industrial society tolerates the total deprivation of future earnings for the collection of debt; and all legal machinery for the enforcement of claims against wages allows some tolerance for the minimal needs of the employee while he works off the debt.

It has been the consistent policy of this State for many years to prevent the denuding of all future compensation for labor to be performed, either through intentional assignment of wages by the worker himself or by legal processes for the collection of debt even though the underlying indebtedness itself may have been incurred through the improvidence or other fault of the worker. For example article 3-A of the Personal Property Law (added by L. 1950, ch. 823) closely regulates the conditions under which assignments of future earnings will be valid. It expressly exempts a basic portion of the assignor's earnings which cannot be made the subject of assignment. (§ 48-b.)

The provisions of section 684 of the Civil Practice Act carefully limit the proportion of wages which are subject to continuing levy; and the provisions of section 793 of the Civil Prac-

tice Act authorizing a direction for installment payment of a judgment, require that the court shall take into account " the reasonable requirements of the judgment debtor and his family " as well as garnishees and assignments which may relate to his future earnings. (See, also, Labor Law, §§ 197, 198; Penal Law, § 1272.) It is clear, therefore, that the law of New York will not countenance a complete taking of future wages to be earned by a worker either by the act of public authority or by the consent of the worker himself.

Indeed the Industrial Commissioner concedes in this court that the levy of the United States for $140.40 could not be made under the Federal law against future wages, but could attach only to an amount due to claimant at the time of the levy (U. S. Code, tit. 26, §§ 6321–6332). This was the clear holding of the Second Circuit in *United States* v. *Long Is. Drug Co.* (115 F. 2d 983, Augustus N. Hand, C. J.). (See, also, *Matter of Halprin,* 280 F. 2d 407.)

The case before us is somewhat similar in principle to *Matter of Thunelius (Catherwood)* (18 A D 2d 948 [1963]) in which it was held the discharge of claimant as a result of the employer's policy not to tolerate garnishees on wages was not a voluntary leaving of employment without good cause where his indebtedness had become so large as to be regarded as beyond his control. See, also, *Matter of Cowan (Catherwood)* (17 A D 2d 232) where leaving the remaining one of two part-time jobs was held to be with good cause due to the insufficiency of the salary of the remaining job.

Although the Appeal Board speculated that the Director of Internal Revenue might make future levies on each week's wage as it became due, this is clearly not what happened in this case. The levy was literally for " accrued wages " at the time it was made. Upon the basis of a single levy on a particular date the employer advised claimant that future wages would be withheld. We do not doubt that the employer acted entirely in good faith in stating to claimant that " all monies earned would have to be sent " to the Internal Revenue Service. But whether or not claimant knew her legal rights in such a situation, her decision not to accept a total deprivation of future earnings was legally correct and she is entitled to the benefit of the correct position.

We add that it would easily have been possible to enforce the lien by processes which would have allowed claimant enough of her wages for the sustenance of herself and her young child while the debt was being worked out. Claimant left her job for good cause.

The decision of the Unemployment Insurance Appeal Board should be reversed, with costs to appellant, and the claim remitted to the Industrial Commissioner.

REYNOLDS, J. (dissenting). It is my view that under the facts of this case the decision of the Unemployment Insurance Appeal Board that claimant left her employment without good cause within the meaning of section 593 (subd. 1, par. [a]) of the Unemployment Insurance Law (Labor Law, art. 18) was eminently correct. At the outset, the statement of facts as set forth in the majority opinion should be clarified. The claimant quit her job on August 30, 1961 and thereafter filed a claim for unemployment benefits on the ground that she was laid off because work was slow. This was not only found to be a willful false statement but is concededly so. The Industrial Commissioner determined that she voluntarily left her employment without good cause and denied unemployment benefits. Claimant requested a hearing before a Referee stating that she objected to the determination " because I did not just quit, my boss didn't want to be bothered with taking out tax." This statement was not borne out before the Referee, and contrariwise claimant testified that she left because she would have to be off for a few weeks anyway and that she intended to quit prior to the service of the Internal Revenue levy to take care of her seven-year-old child saying " I was going to quit for a little while anyway the 1st of September. I was going to quit." Sweeping under the rug *claimant's own testimony* that she quit for personal reasons, the Referee found that she quit because of the tax levy and the employer's intent, upon instructions from the Internal Revenue Service, to withhold her entire wages to pay the amount due the Government and this constituted good cause. The Unemployment Insurance Appeal Board disagreed and overruled the Referee saying in part:

" We are not in accord with the referee's conclusion. The employer merely conveyed to claimant information obtained from the Federal authorities. It must be assumed that if additional levies were required under the pertinent statutes to effectuate a valid lien on claimant's future earnings, such levies would have been duly issued and served.

" Claimant created the situation by permitting her delinquency to continue until such time as the Federal authorities were compelled to resort to the drastic measures which were here invoked. Her decision to leave the employment to avoid the application of her wages to the liquidation of the indebtedness was not based on good cause under the Unemployment Insurance Law."

Although the board did not say so (beyond holding that the quit was not for good cause) it is obvious that its decision, in part, was based on the record which clearly shows on claimant's own testimony that she quit for personal reasons unconnected with the Internal Revenue Service's actions. With administrative decisions which are often incomplete and sometimes inartistically drawn, we cannot assume a rejection of this testimony as the majority is attempting to do here. True the board additionally disagreed with the Referee's finding that her decision to leave the employment to avoid the application of her wages to the liquidation of her indebtedness constituted good cause for the quit, but this does not constitute a rejection. The majority, it would appear, is concerned that claimant was faced with the prospect of working for two weeks with all wages withheld without legal warrant. They feel that during such a period she might have been forced to go without sustenance and be unable to provide the same for her young child. But the record does not reveal evidence of any such possible deprivation, and, in fact, the only evidence is to the contrary since it appears she also had a 25-year-old son residing with her who was working as a postal employee and at least paying the rent. On the other hand, the majority chooses to minimize the fact that the debt which the Government was trying to collect was a valid and subsisting obligation incurred by claimant and that the defect in the manner of collection was one of form only, since the Government could by proper means, have succeeded in reaching claimant's wages. The levy itself was legal (accrued wages); the direction of the Internal Revenue Service to withhold future earnings was not. In addition the majority's opinion implies that this calamitous situation arose in part because of action or inaction on the part of the employer. When faced with the Revenue Service's order, can it be claimed that the employer should have disregarded it or that the employer, rather than claimant who was delinquent in paying her taxes, was obligated to question and, perhaps, even litigate the validity of the Service's directive? An examination of the record will show that the employer herein should be commended for his efforts on claimant's behalf. Furthermore, it is clear that at the time claimant left employment she was completely unaware of the invalidity of the threatened attachment. The majority opinion holds this of no consequence because claimant's position was later proved legally correct, but since we are examining the reason for her quitting at the time she took such action and when she admittedly was unaware of any legal defect, whether or not the attachment later proved to be in legal form is, in my view,

immaterial, especially since the Service by proper procedure could have reached her wages in any event. If the Service's order was illegal it should have been attacked by the claimant by use of the appropriate legal remedies rather than by leaving employment. The present record would support a finding by the board that the alternatives claimant believed she had at the time she left employment were whether to keep working and thus rid herself of her debt to the Federal Government or quit and evade payment of her debt by using the Unemployment Insurance Law, and that in choosing the latter course of action she left employment without good cause. Thus the majority by its decision is, in effect, establishing a rule that leaving employment is with good cause where it was perpetrated to avoid payment of a debt because the collection process is onerous on the debtor. Unemployment insurance was intended as a substitute for a complete loss of wages forced upon an employee (see *Matter of Sellers* [*Mays, Inc.*], 13 A D 2d 204, 206). I fail to find such to be the case here, but rather I see an attempt to evade payment of a legally constituted debt. If we say that there is no good cause where there's a quit because of a desire for higher pay, or more opportunity for promotion or because of a preference for other types of work (*Matter of Davis* [*Catherwood*], 15 A D 2d 608; *Matter of Pillersdorf* [*Corsi*], 278 App. Div. 59; *Matter of Marcus* [*Corsi*], 278 App. Div. 1037), how can we lay down a rule of law which holds that a quit is with good cause where it was perpetrated to avoid payment of a debt? By reversing as a matter of law we would be laying down a legal rule that a voluntary quit is with good cause where there is an attachment or withholding of most or all of a claimant's wages. This does not seem in harmony with our prior decisions concerning good cause and goes beyond the bounds of extreme liberalness already set in the law and in its construction. *Matter of Thunelius* (*Catherwood*) (18 A D 2d 948) is inapposite here. In that case Thunelius was discharged because of a rule of the employer against garnishees. It did not involve a quit. In passing, there was a vigorous dissent in *Thunelius* by two members of this court and the case has not reached the Court of Appeals.

What constitutes " good cause " is not defined in the statute (Labor Law, § 593) and is a question of fact for the board (*Matter of Lipschitz* [*Lubin*], 7 A D 2d 777; *Matter of Karman* [*Lubin*], 2 A D 2d 626). Our province to review factual determinations of the board is limited to determining if the record contains substantial evidence to support the decision (Labor Law, § 623; *Matter of Mutual Benevolent Soc. of 1865* [*Corsi*],

293 N. Y. 901; *Matter of Knox* [*Catherwood*], 18 A D 2d 1123). We may not assume the authority of the Unemployment Insurance Appeal Board by holding the issue of fact an issue of law. The board has determined as a factual matter that this was not a good quit. Considering elements in the record other than the naked attachment question (lack of any evidence, much less a claim, that she couldn't exist for two weeks) I think the action of the majority in reversing on the law is unjustified.

The decision of the Unemployment Insurance Appeal Board should be affirmed, without costs.

Coon, Gibson and Taylor, JJ., concur; Reynolds, J., dissents, in an opinion, and votes to affirm.

Decision of the Unemployment Insurance Appeal Board reversed, with costs to the appellant, and claim remitted to the Industrial Commissioner.