Dorcas BOND and Barbara Baldwin,
Plaintiffs-Appellees,

v.

William H. DENTZER, Individually and
as Superintendent of the Banking Department of the State of New York,
Defendant-Appellee,

Beneficial Finance Company of New York,
Inc., and Protective Loan Corporation, Defendants-Appellants.

No. 609, Docket 73–2377.

United States Court of Appeals,
Second Circuit.

Argued Dec. 10, 1973.

Decided March 13, 1974.

Kaufman, Chief Judge, dissented
with opinion.

Philip G. Schrag, New York City (Joel F. Spitzer, The Legal Aid Society of Albany, Inc., Albany, N.Y., of counsel), for plaintiffs-appellees.

John T. DeGraff, Albany, N.Y. (William H. Allen, Eugene D. Gulland, Washington, D. C., for Beneficial Finance Co. of New York, Inc.; Harvey M. Lifset, Albany, N.Y., for Protective Loan Corp., on the brief) (DeGraff, Foy, Conway & Holt-Harris; Albany, N. Y., Covington & Burling, Washington, D. C., of counsel), for defendants-appellants.

Jack Greenberg and Eric Schnapper, NAACP Legal Defense & Education Fund, Inc., New York City, for amicus curiae.

Bernstein, Seawell, Kaplan & Block, New York City (Frederick H. Block, Harvey N. Goldstein, New York City, of counsel), for Household Finance Corp., amicus curiae.

Before KAUFMAN, Chief Judge, MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

On October 12, 1970, the plaintiffs brought an action in the United States District Court for the Northern District of New York against Beneficial Finance Company of New York, Inc. and Protective Loan Corporation, as well as the Superintendent of the Banking Department of the State of New York, seeking *inter alia,* a declaration that the N.Y. Personal Property Law Art. 3–A (McKinney's Consol.Laws, c. 41 1962), as amended, (McKinney Supp.1973), and the N.Y. Banking Law Art. 9 (McKinney's Consol.Laws, c. 2 1971) are unconstitutional. The corporate defendants are loan companies licensed by the Banking Department pursuant to Article 9 of the Banking Law, to engage in the business of making small loans.

The plaintiff Dorcas Bond executed a wage assignment as security for a loan of money from the defendant Beneficial. She used the money to purchase a washing machine from a third party. Since the machine proved defective, she decided that she was no longer bound to make loan repayments. On or about September 1, 1970, Beneficial determined that she was in default and a copy of her wage assignment was filed with her employer. The plaintiff claims that she received no prior notice of the creditor's intent to enforce the assignment. The employer took no action since Bond was no longer in its employ. Beneficial agreed not to seek enforcement of the assignment pending resolution of this suit.

The plaintiff Barbara Baldwin also executed an assignment of wages as security for a loan of money from the defendant Protective. On or about September 1, 1970, Protective determined that she was in default and caused a copy of the wage assignment to be served upon her employer. Baldwin makes the claim that she did not receive prior notice of the assignment and further claims that she has good and sufficient defenses, including fraud and deceit, to bar the enforcement of the assignment. Baldwin's employer did de-

duct 10 percent of her gross weekly income and paid it to Protective until November 2, 1970, when Protective agreed not to enforce the assignment pending a final judgment in this case.

In the action below, plaintiff moved for the convening of a three-judge court under 28 U.S.C. §§ 2281 & 2284, and also sought permission to prosecute the suit as a class action. On April 19, 1971, the Hon. James T. Foley, United States District Court Judge, Northern District of New York, in an opinion reported at 325 F.Supp. 1343, denied the motion for the convening of the three-judge court, finding that the Superintendent of Banking had no responsibility for the enforcement of Article 3–A of the Personal Property Law, which is the basic codification of the law of wage assignments in New York. He found no interrelationship between that statute and Article 9 of the Banking Law under which the corporate defendants were licensed. He also denied the request for class action status on the ground that there were numerous institutions using wage assignments in addition to the two named defendants, and also because there could be a wide factual variance in the claims of debtors. Plaintiffs then sought a writ of mandamus from this court to compel the district court to convene a three-judge court and to permit the case to proceed as a class action. This court denied the petition by order dated May 14, 1971. (Docket No. 71–1467).

On July 25, 1973, the district court granted the plaintiffs' motion for summary judgment and denied the defendants' motion to dismiss. 362 F.Supp. 1373. In addition to finding state action within the meaning of 28 U.S.C. § 1343 and 42 U.S.C. § 1983, the court determined that sections 46–49 of Article 3–A of the Personal Property Law were unconstitutional on their face and as applied insofar as they provided for execution against wages by service of a wage assignment upon an employer without meaningful notice to the assignor and without an opportunity for him to be heard. They were deemed to be violative of the Due Process Clause of the Fourteenth Amendment. Finding no state action, we reverse.

 It is not and cannot be disputed that the Fourteenth Amendment applies only to action by the State and not to action which is private. The "action" found offensive below is the filing of the wage assignment by the defendants with the employers of the plaintiffs, which they claim gives creditors the power to unilaterally decide when a debt exists and default occurs, thus precluding the debtor from effectively and realistically challenging the determination before the creditor takes the wages. If this action is private, we need not reach the merits of the due process question.

Concededly, there is no participation here by any state officer or agent, which serves to distinguish this case from both Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (ex parte issuance of a summons by a court clerk pursuant to a Wisconsin statute authorizing prejudgment wage garnishment), and Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (replevin by summary writs issued by state courts and executed by state officials). The only state officer sought to be joined here, the Superintendent of Banks, was properly dismissed as a defendant by the court below in its order of April 19, 1971, since he plays no role whatever in the implementation of the wage assignment provisions of Article 3–A of the Personal Property Law.

The district court, however, found that "state action" could be bottomed on three principles which we will examine.

### 1) PARTNERSHIP

 The court below, relying upon Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), found that state action exists here because the State has become a partner or a joint venturer with the creditor finance companies. In *Burton,*

a restaurant, privately owned but open to the public, refused to serve a Negro only because of his color. The restaurant was located in a building owned by a state-created parking authority and leased from the authority. Aside from the offensiveness of the conduct involved, the State had provided the property where it occurred. This type of state participation is not present here. The loan companies are not the recipients of state aid by grant or loan and their facilities are privately owned. The "entwinement" cases, of which *Burton* is the prototype, represent generally cases of direct government subsidization, by grant or loan, of otherwise private institutions. They represent factual patterns so much at variance with the facts in this case that any further discussion of them is not fruitful here.[1]

■ The court below also found a partnership to exist, apparently on the basis of the state licensing regulation which, it opined, gives "private interests . . . such economic advantages that they become business partners with the state in the regulation." 362 F.Supp. at 1378. While the district court found no inconsistency between this view and Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), our recent opinion in Wahba v. New York University, 492 F.2d 96, 100 (1974) indicates otherwise. Judge Friendly there noted:

The Court in *Moose Lodge* could not have meant the reference to partners or joint venturers to be satisfied with some commonalty of economic interests *simpliciter,* since as a comment has pointed out, The Supreme Court 1971 Term, 86 Harv.L.Rev. 1, 73–74 (1972), such interests existed in a substantial degree in that case itself. The lodge received from the state permission to operate a lucrative business and obtained a valuable property right in the liquor license itself; the state,

operating a monopoly system, was provided with a distributor that produced substantial revenue.

■ The State here does not receive any revenue from the licensing of lenders, and the finance companies, in any event, do not enjoy any monopoly in the lending of money on the security of wage assignments. Banks, trust companies and credit unions are authorized to loan money on such security and in fact are not required to comply with all the restrictions on wage assignments imposed by Article 3–A of the Personal Property Law. See N.Y.Pers.Prop.Law § 49 (McKinney 1962). Judge Mansfield's decision in Seidenberg v. McSorleys' Old Ale House, Inc., 317 F. Supp. 593 (S.D.N.Y.1970), also relied upon below, dealt with a restaurant which engaged in discriminatory practices and was dispensing liquor to the public, a business which could only be conducted by obtaining a liquor license from the State and the control of which by the State was found to be pervasive. Moreover, the sale of liquor produced tax revenue for the State. The mere fact that the defendants here have operated under a license issued pursuant to Article 9 of the Banking Law is surely no reason to find state action. As we have pointed out in a comparable situation: "[t]his is true also of every corporation chartered under a special or even a general incorporation statute, and not even those taking the most extreme view of the concept have ever asserted that state action goes that far." Powe v. Miles, 407 F.2d 73, 80 (2d Cir. 1968). The requisite state action must be related to the challenged activity. Shirley v. State Nat'l Bank, 493 F.2d 739, 743 (2d Cir. 1974). Moreover, as we will discuss in Part 2 of this opinion, the regulation provided by both Article 3–A of the Personal Property Law and Article 9 of the Banking Law, is conspicuously and designedly for the benefit of the borrower and not the lender.

1. See, e. g., Wahba v. New York University, 492 F.2d 96, (2d Cir. 1974) ; Grafton v. Brooklyn Law School, 478 F.2d 1137 (2d Cir. 1973) ; Male v. Crossroads Associates, 469 F.2d 616 (2d Cir. 1972).

■ The third alleged basis of state "partnership" found below is the "silent" partnership of the judicial branch of state government "using its power to further the acts of private interests which deprive a person of constitutional rights." 362 F.Supp. at 1378. The court cited Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) and Brinkerhoff-Paris Trust & Savings Co. v. Hill, 281 U.S. 673, 50 S.Ct. 451, 74 L.Ed. 1107 (1930), neither one of which has any relevance here as far as we can see. In *Shelley,* the Supreme Court did find state action when state courts enforced offensive, racially discriminatory restrictive covenants. Here, however, no state court has precluded the debtors from doing anything. The gist of the claim is that the wage assignment agreement permitting the unilateral action of the creditor is sanctioned by the state legislature. It is the purported circumvention of the courts which is complained of and not their intrusion. *Brinkerhoff-Farris Trust & Savings Co.* is equally inapposite. There, state action was found when a state court, overruling its own prior decisions, deprived a claimant, without adequate notice, of his right to contest a discriminatory state tax. Here, of course, no decision of any state court has denied the plaintiffs of any right to be heard.[2]

## 2) ENCOURAGEMENT

■ The court below found encouragement by the State of New York and thus state action because the statutory scheme of Article 3–A of the Personal Property Law "commands" the procedures that purportedly deprive the plaintiffs of their constitutional right of due process, *i. e.,* the right to a hearing before the wages are attached. 362 F. Supp. at 1179. The argument made here is similar to that made by the plaintiffs and rejected by this court in Shirley v. State Nat'l Bank, *supra.* The State in this case has not deprived the plaintiffs of anything. They have entered into agreements with the defendants in which they have secured funds on the distinct understanding that if there is a default on the loan, the creditor may attach and collect a percentage of the debtor's wages. It was ever thus. A lender who advances money without any security except the fact that his debtor is employed, expects to be able to have access to the security without the necessity of commencing a law suit to establish the debt. No one has cited here nor have we found any case in this State which, prior to the enactment of Article 3–A of the Personal Property Law, found that the assignment was unenforceable unless the debt were first judicially established. The statute therefore does not take away something which previously existed. In fact, section 47–e of the Personal Property Law creates an action for the debtor if he wishes to contest the debt, and it is not argued that any such action existed at common law.

The argument is raised that since the wage earner is impecunious and is at the mercy of the finance corporation, the contract which he formally enters into is a contract of "adhesion" and presumably is to be disregarded. We, of course, agree that those who have no other security to offer but wages represent overwhelmingly that segment of the population which is at the lower rungs of the economic ladder. This is precisely why the State of New York has legislated. Absent the wage assignment device, the poor are left to the tender ministrations of the loan sharks, whose rates of interest and methods of enforcement are

---

2. Although N.Y.Pers.Prop.Law § 47–e (McKinney Supp.1973) provides that "[a]n assignment may be vacated by a judgment of a court of record upon a special proceeding brought by the assignor, his employer or any person having an interest therein," the plaintiffs have never sought such relief.

The defendants here have commenced an action in the New York Supreme Court, Albany County, against the plaintiffs seeking a declaratory judgment as to the meaning of various provisions of Article 3–A and their constitutionality, but there has been no final decision in that case.

well understood by this court and anyone who reads its opinions or even the pages of the public press. Present Article 3–A was the product of a New York State Law Revision Commission Study and Recommendation. The policy of the State as revealed in the Commission Recommendation (1950 N.Y.Legis.Doc. No. 65(A)) is manifest. The State is concerned that the poor, who often have no other security but wages, have access to credit without resorting to loan sharks, and at the same time the State wishes to protect the debtor from overreaching. The safeguards afforded the debtor by the challenged Article are numerous.

Section 46–c(a) provides that the assignment shall be made in a separate written instrument in which all printed material is in at least eight point type, with the title "Assignment of Wages, Salary, Commissions or other Compensation for Services" in ten point bold type. Subsection (b) requires that the transaction to which the assignment relates be described fully, including the name and address of the assignee, the consideration given, and the date and place at which payments are to be made. On the face or back of the instrument there must be a summary of sections 46–c, 46–e, 46–f, 48, 48–a, 48–b, 48–c and 49 of the Article.[3]

Section 46–e invalidates an assignment unless it is personally executed by the assignor and copies of the assignment and attached papers are delivered to the assignor.

Section 46–f limits the amount of interest collectable on a loan and bars other charges disguised as investigative costs or charges for the drawing of papers. Violation of this section is a misdemeanor.

Section 47 mandates filing of the assignment with the county clerk before it is filed with the assignor's employer.

Section 47–d provides for a certificate of cancellation upon the payment of the debt.

Section 47–e provides for the vacation of an assignment upon application of the assignor, his employer or any person having an interest by court order in a special proceeding.

Section 48 requires that an assignee of future earnings wait 21 days after default by the assignor, notify the assignor of the default and wait another 10 days before filing the assignment with the employer.

Section 48–a limits the amount collectable in any month to no more than 10 percent of the assignor's future earnings payable in such month.

Section 48–b prohibits the withholding of earnings unless such earnings amount to at least the sum of 30 dollars per week if the assignor is employed in a city of 250,000 or more and 25 dollars per week elsewhere.

■ It is abundantly clear that Article 3–A was primarily concerned with the protection of the wage earner-assignor and that its provisions were designed, not to encourage the assignment of wages, but to discourage the overreaching of the wage earner. The fact that the statute provides that only wage assignments made pursuant to Article 3–A are collectable is merely a recognition of what had been true at common

---

3. We have noted that section 47–e, providing for the vacation of wage assignments, is absent from the list of sections required to be printed in the agreement. Our review of the legislative history has revealed no reason for this omission, and it may well have been due to inadvertence in view of New York's exhibited concern that debtors be afforded a swift and meaningful remedy for vacating invalid assignments. New York adopted remedial legislation establishing a simplified procedure for vacation as early as 1941. See

Law of April 28, 1941, ch. 867, [1941] N.Y. Laws 164th Sess. p. 1977; Sheer v. Family Finance Corp., 46 N.Y.S.2d 398 (Sup.Ct. 1944). When this did not prove sufficient to protect the rights of debtors, the New York Legislature acted in 1960 to correct what the Governor characterized as "defects" in the prior law. Message of the Governor, 1960 McKinney Sess.Laws of N.Y. at 2010. In any event, plaintiffs do not consider that the section 47–e action provides "Due Process."

law before the statute was enacted, except that procedural and substantive safeguards were provided to protect the wage earner from loan shark techniques. The protection of the wage earner against the avarice of the finance company is further attested by the provisions of Article 9 of the Banking Law.[4]

In this context, the phrase "contract of adhesion" becomes meaningless. In view of the admittedly unequal bargaining positions of the parties, the impoverished debtor is not subjugated to the whim of the creditor—the terms of the agreement are fixed by the State which has equalized the bargaining posture of the borrower. See generally Kessler, Contracts of Adhesion—Some Thoughts about Freedom of Contract, 43 Colum.L.Rev. 629 (1943).

The argument is made on this appeal that by the very existence of Article 3–A, the wage assignment device is sheltered from attack by the courts, by local legislative bodies and by an "evolving pattern of industrial conduct." In short, the fact that the State has enacted legislation, *per se,* creates "state action." Appellants argue that Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18

L.Ed.2d 830 (1967), presents a precise parallel. We cannot agree.

*Reitman* involved an amendment to the California State Constitution, Proposition 14, which banned the State from imposing any limitation on the right of a person to dispose of his real property. The amendment, in effect, created a state constitutional right to discriminate, repealing prior acts of the state legislature which had regulated racial discrimination in housing. The Supreme Court held that this effectively constituted state action which encouraged racial discrimination. Mr. Justice White pointed out in his opinion for the Court:

> Private discriminations in housing were now not only free from [the regulatory statutes] but they also enjoyed a far different status than was true before the passage of those statutes. The right to discriminate, including the right to discriminate on racial grounds, was now embodied in the State's basic charter, immune from legislative, executive, or judicial regulation at any level of the state government. Those practicing racial discriminations need no longer rely solely on their personal choice. They

4. "The purpose of [Article 9] is to protect from exorbitant and unconscionable demands the poor and needy who are compelled to borrow small sums to meet a pressing necessity. London Realty Co. v. Riordan, 207 N. Y. 264, 269, 100 N.E. 800 . . . ." Hennessey v. Personal Finance Corp., 176 Misc. 201, 204, 26 N.Y.S.2d 1012, 1016 (Sup.Ct.1941). See also In re Radner, 36 F.Supp. 964 (S.D.N.Y.), aff'd, Madison Personal Loan v. Parker, 124 F.2d 143 (2d Cir. 1941).

Section 340 requires that persons and organizations in the business of making small loans obtain from the Superintendent of Banks a license which subjects them to the regulatory provisions of Article 9. (Prior to 1973 small loans were those amounting to 1400 dollars or less; the sum has now been raised to 2500 dollars). Section 343 provides the conditions under which a license may be issued, including a finding by the Superintendent "that the financial responsibility, experience, character, and general fitness of the applicant . . . are such as to

command the confidence of the community and to warrant belief that the business will be operated honestly, fairly, and efficiently . . . ." Licensees are required to maintain books and records (§ 350) and the Superintendent is authorized to make investigations at any time, and at least once annually, to assure compliance with the Article. § 349. Non-compliance may result in the revocation of the license. § 348.

Many violations of Article 9 are penal and void the loan. § 358. Section 352, for example, forbids devices to split loans to secure higher interest rates than those set by the Article and prohibits deduction of interest in advance and the compounding of interest. Section 356, which is the only section in Article 9 directly related to wage assignments, invalidates an assignment where the loan is not paid to the borrower simultaneously with the execution of the assignment and limits any levy under the assignment to 10 percent of the assignor's wages at the time they are payable.

could now invoke express constitutional authority, free from censure or interference of any kind from official sources.

387 U.S. at 377, 87 S.Ct. at 1632.

 The distinction between *Reitman* and the present case is clear. In *Reitman*, the amendment encouraged discrimination by repealing prior law and by greatly inhibiting any subsequent change. See Black, The Supreme Court, 1966 Term, Forward: "State Action," Equal Protection, and California's Proposition 14, 81 Harv.L.Rev. 69, 74–75 (1967). Article 3–A was not regressive in the field of debtors' rights and there is no constitutional immunization from further change. Clearly, the New York Legislature is still free to act and indeed it has acted to prohibit wage assignments in certain cases.[5] The argument that Article 3–A is immunized from attack by state courts and local agencies, and that this constitutes state action, is not persuasive. All legislative expressions of public policy prevent courts from reaching contrary conclusions. Moreover, any state statute which preempts a field precludes local agency legislation. See, e. g., Myerson v. Lentini Bros. Moving & Storage Co., 33 N.Y. 2d 250, 351 N.Y.S.2d 687, 306 N.E.2d 804 (1973). Thus the argument, followed to its logical conclusion, would provide an omnibus basis for finding encouraging state action simply because of the fact of legislation. We implicitly rejected such a concept in Shirley v. State Nat'l Bank, *supra*, in which we dealt with a Connecticut codification of the common law right of self-help repossession in conditional sales transactions. What we said there is equally applicable here:

> Codification did not encourage the practice one whit. As we have pointed out, the legislation made it less attractive by providing greater safeguards . . . .

493 F.2d at 744. The argument that the Article shelters the wage assignment device from an evolving pattern of industrial and commercial conduct, has the virtue of novelty but again has no basis in reality or logic. Cf. Lucas v. Wisconsin Elec. Power Co., 466 F.2d 638, 657 (7th Cir. 1972), cert. denied, 409 U.S. 1114, 93 S.Ct. 928, 34 L.Ed.2d 696 (1973). Judge Foley in his memorandum decision and order filed April 19, 1971, denying plaintiffs' motion to convene a three-judge court and granting the defendants' motion to dismiss the class action sought to be maintained, stated:

> Further, if this New York statute is deficient, or not clear in its wording to prevent the injustice claimed by plaintiffs, then a common sense way to correct it would be to interest the Legislature of New York to change or improve the wording to embrace for court consideration fraud in lending and taking of the assignment. The Attorney General of New York has been foremost in the Nation in the creation of bureaus and divisions in his office that police and act upon grievances of this kind. No policy by any lawyer or group of lawyers seems sensible that bypasses these channels that might easily correct and avoid the filing of these obvious burdensome suits in federal or state courts. Relief from hardships imposed by State statute is the responsibility of a state legislature unless some constitutional right is infringed. (Nelson v. New York City, 352 U.S. 103, 110–111, 77 S.Ct. 195, 1 L.Ed.2d 171).

325 F.Supp. at 1351–1352. We are inclined to agree that the Attorney General of the State of New York and the New York State Legislature are perfectly competent to recommend and to effectuate statutory changes to succor the credit consumer. The continuing amendments to Article 3–A indicate a

---

5. See N.Y.Pers.Prop.Law § 413(10)(b) (McKinney Supp.1973), which precludes the inclusion of a clause in a retail instalment credit agreement providing for the assignment of wages.

liberal and sympathetic attitude.[6] We do not flinch from an inquiry into the due process issue, but under constitutional principles enunciated by the Supreme Court, we must first find state action, and we see no parallel to *Reitman* in the "immunization" argument made on this appeal.

### 3) TRADITIONAL STATE FUNCTIONS

The final basis for state action urged here is that when a private person is performing, pursuant to a right accorded by statute, a function traditionally performed by the State, the acts of the individual may be described as state action. The difficulty with this position is that the legislation does not vest the assignee with any function traditionally performed by the State. The function of the wage assignment has always been that of a private levy without a prior court order. There was never any requirement or practice that has been called to our attention which mandated the creditor to first establish the debt before attaching the wages and which the State has now abrogated. In fact, as our prior discussion indicates, the State has created a right on the part of the debtor to question the debt by initiating an action which was not known at common law. In sum, the statute has not given the assignee anything new; it has in fact circumscribed substantially the rights of the creditor which were untrammeled at common law.

Our analysis of the involvement of the State of New York in the wage assignment device compels the conclusion that the legislature has not intruded at all into the so-called offensive conduct complained of here, but rather has regulated the terms of the arrangement to prevent the gouging of the impecunious. Article 3–A of the Personal Property Law, as well as Article 9 of the Banking Law, reveals a clear legislative concern to protect the necessitous from the loan shark by setting maximum interest rates and the maximum amount of the levy, and by otherwise assuring that the borrower be equitably treated. Even the size of the print in the agreement is fixed by statute. We are frankly loathe to interfere with this legislative judgment which represents years of measured policy making. It may be, as defendants urge, that a requirement·that plenary suit first be brought will either jeopardize the marketing of such credit or result in increased costs which can only add further to the burdens upon those already financially embarrassed.

The failure of the State to mandate a plenary action to establish the debt when none has ever been required by case law and is not required by the agreement, constitutes not only an absence of state action but also cannot be properly characterized as offensive or shocking. If the borrower uses funds to buy merchandise from a third person which proves to be defective, we are at a loss to understand how this provides him any excuse for failure to pay the loan as agreed. Yet, the plaintiff Bond claims that her constitutional rights are infringed since the defendant Beneficial is not required to sue her to establish the debt so that she can present the defense of breach of warranty. Both plaintiffs claim that the defendants were guilty of fraud and deceit without any particularization or suggestion of what this may be. In view of the detailed statutory safeguards we have discussed, it is diffi-

---

6. Although wage assignments were well known in New York before the adoption of Article 3–A of the Personal Property Law (see Field v. New York, 6 N.Y. 179 ʹ(1852) ; Continental Purchasing Co. v. Van Raalte Co., 251 App.Div. 151, 295 N.Y.S. 867 (4th Dep't 1937)) ; 3 Williston, Contracts § 413 (3d ed. 1960)), "[w]age assignments are not favored by New York Courts. In re Jones' Claim, 19 A.D.2d 330, 242 N.Y.S.2d 1004, aff'd 14 N.Y.2d 558, 248 N.Y.S.2d 652, 198 N.E.2d 40. The legislature has surrounded such assignments of future earnings with closely regulated conditions for the protection of the wage earner and his family. Personal Property Law Art. 3–A." Ray Bills Finance Corp. v. Mead,ʹ 60 Misc.2d 1051, 1052, 304 N.Y.S.2d 356, 357 (Sup.Ct. 1969).

cult to imagine what kind of fraud or deceit could be established in a transaction, the terms of which by and large are predetermined by statute. The claim of failure to notify the plaintiffs of the filing of the assignment with the employer is moot in the case of Bond and is controverted in the case of Baldwin.

Judge Friendly, writing for this court in Wahba v. New York University, *supra*, observed that the finding of state action "hinges on the weighing of a number of variables, principally the degree of government involvement, the offensiveness of the conduct,[7] and the value of preserving a private sector free from the constitutional requirements applicable to government institutions." 492 F.2d at 101–102 (footnote added). Here, we find no state action since there is no significant involvement of the State in the challenged conduct. Moreover, the statutory scheme under attack reveals not an offensive or insensitive attitude, but rather one of understanding and beneficence toward the borrower. The State has sought to preserve and to insure that the needy have recourse to legitimate outlets of credit.

Reversed.

KAUFMAN, Chief Judge (dissenting):

After reading my brothers' opinion as a sequel to Shirley v. State Nat'l Bank, 493 F.2d 739 (2d Cir. 1974), I can at least applaud them on their consistency. But, my views too are well known. I stated in Shirley v. State Nat'l Bank, *supra*, 493 F.2d at 745 (Kaufman, C. J., dissenting):

I am of the view that the lawful nonconsensual taking of property is a uniquely governmental function, [and

therefore] I consider its exercise, whether by state officials or by private individuals so empowered, subject to the due process constraints functionally required to avoid arbitrary deprivations.

The device of wage assignment—no matter how old, how sacred, how firmly embedded in our common law tradition —rests nevertheless on the private implementation of the state's monopoly power over binding conflict resolution. When a finance company unilaterally determines that the assignor-debtor is in default, the essential predicate for triggering the wage assignment mechanism —and then takes the drastic step of seizing a significant property interest without the consent of the holder—it is performing an adjudicative function which is a fundamental component of the role of government in our society.

Appellants urge, however, and the majority agrees, that this delegation of power to the private sector—this waiver, in effect, of the debtor's constitutional right to have default determined under the aegis of government, with the procedural requirements attendant thereto—is sanctified by the consensual nature of the wage assignment agreement. Yet, the language of these agreements includes no mention of the procedural safeguards the debtor is asked to relinquish. Thus, my comment in Shirley v. State Nat'l Bank, supra, 493 F.2d at 745, n. 1 (Kaufman, C. J. dissenting), applies with equal force here:

As in Fuentes v. Shevin, 407 U.S. 67, 94–96, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the fact that the plaintiff signed a form contract which authorized [wage assignment] will not immunize a seizure, under a waiver theory, where it is otherwise defective be-

---

7. We noted in Shirley v. State Nat'l Bank, 493 F.2d 739, 744 (2d Cir. 1974) that this court has frequently indicated that the resolution of the state action question reached in a case involving racial discrimination may well and properly differ from that adopted in other contexts. United States v. Wiseman, 445 F.2d 792, 795 n. 3 (2d Cir.), cert.

denied, 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed. 2d 287 (1971); Lefcourt v. Legal Aid Society, 445 F.2d 1150, 1155 n. 6 (2d Cir. 1971); Powe v. Miles, 407 F.2d 73, 82, 85 (2d Cir. 1968); Wolin v. Port Authority, 392 F.2d 83, 89 (2d Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1967).

cause the [wages are] seized without prior notice and an opportunity for a hearing. The absence of consent in the taking cannot be cured by resorting to the meaningless ritual of utilizing a contract of adhesion in which the fine print, even if read, fails to mention that the debtor has any right to a pre-seizure hearing.

Moreover, try as I might I cannot fathom how the majority finds comfort in Professor Kessler's commentary on the now vacuous concept of freedom of contract—rendered an anachronism by the advent of the adhesion contract. Indeed, the author captures the very essence of the delegation of power principle by which so-called private conduct is infused with "state action."

> Society, by proclaiming freedom of contract, guarantees that it will not interfere with the exercise of power by contract. Freedom of contract enables enterprisers to legislate by contract and, what is even more important, to legislate in a substantially authoritarian manner without using the appearance of authoritarian forms. Standard contracts in particular could thus become effective instruments in the hands of powerful industrial and commercial overlords enabling them to impose a new feudal order of their own making upon a vast host of vassals.

F. Kessler, Contracts of Adhesion—Some Thoughts About Freedom of Contract, 43 Colum.L.Rev. 629, 640 (1943) (footnote omitted). It strikes me as rather fatuous to argue, as the majority does, that "the phrase 'contract of adhesion' becomes meaningless . . . [because] the impoverished debtor is not subjugated to the whim of the creditor" when perhaps the most critical and certainly the most self-serving determination in the debtor-creditor relationship —default—is left by contract to the creditor, ex parte.

Indeed, by following the "consensual" path hewn by the majority, we go far toward eviscerating the salient teaching of Sniadach v. Family Finance Corp.,

395 U.S. 337, 340, 89 S.Ct. 1820, 1822. 23 L.Ed.2d 349 (1969) concerning the injustices which arise from "prejudgment garnishment whereby the sole opportunity to be heard comes after the taking." To be sure, my brothers have no difficulty whatsoever with *Sniadach* and with a mere nod they indicate their awareness of its existence. They then proceed to distinguish *Sniadach* from this case by noting the absence here of the court clerk's purely ministerial role in *Sniadach* in issuing the ex parte summons. Meaningless distinctions of this sort are intended to give the appearance of continuity of the law, when in fact the majority here has clearly parted company with the Supreme Court's rationale in *Sniadach* and *Fuentes*. It can hardly be questioned that the result of the filing of the wage assignment in this case was the equivalent in its effect to the garnishment proceedings in *Sniadach*. If the debtor's consent to the wage deprivation is not meaningful, as it cannot be without at least an understanding of the procedural shortcuts which follow wage assignment, *compare* Swarb v. Lennox, 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972) *with* D. H. Overmyer v. Frick Co., 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972), then that "consent" serves merely to camouflage the taking. The words of the Court, though uttered in a different context, are strikingly appropriate:

> To hold otherwise would be to exalt artifice above reality and to deprive the [decision in *Sniadach*] of all serious purpose.

Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266, 268, 79 L.Ed. 596 (1935).

Nor can New York's wage assignment statute be cleansed of its constitutional impurities by relying on the benevolence of the New York legislature in promulgating it. The Court, in *Sniadach*, was quite explicit about the relevance of good intentions:

> The question is not whether the Wisconsin law is a wise law or [an] unwise law. Our concern is not what

philosophy Wisconsin should or should not embrace. [citation omitted]. We do not sit as a super-legislative body. In this case the sole question is whether there has been a taking of property without that procedural due process that is required by the Fourteenth Amendment.

Sniadach v. Family Finance Corp., *supra*, 337 U.S. at 339, 89 S.Ct. at 1821.

Accordingly, since I find the requisite "state action" in the appellants' performance of the uniquely public function of adjudication,[1] and because the § 47–e "special proceeding" requires initiation by the debtor, a burden we have found constitutionally impermissible in our recent decision, Hernandez v. European Auto Collision, Inc., 487 F.2d 378, 385 n. 4 (Timbers, J. concurring in an opinion joined by Lumbard, J.), I would affirm Judge Foley's decision—a well reasoned and sound analysis of the law.

---

1. I fail to understand the majority's reliance on Judge Friendly's three-pronged test in Wahba v. New York University, 492 F.2d 96, 101–102. It has no relevancy to this case since, unlike *Wahba*, a finding of "state action" here would not turn on the applicability of the "partnership" or "symbiosis" test.