Shirley Herriott BROOKS and Gloria Jones, Individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

FLAGG BROTHERS, INC., Individually and as representative of a class of all others similarly situated, et al., Defendants-Appellees.

No. 523, Docket 75–7437.

United States Court of Appeals, Second Circuit.

Argued Feb. 13, 1976.

Decided April 7, 1977.

Martin A. Schwartz, White Plains, N. Y. (The Legal Aid Society of Westchester County, White Plains, N. Y., on the brief, Lawrence S. Kahn, Evelyn K. Isaac, New York City, of counsel), for plaintiffs-appellants.

Alvin Altman, New York City (Brodsky, Linnett & Altman, New York City, on the brief, Michael J. Barnas, New York City, of counsel), for defendants-appellees Flagg Brothers, Inc., and Henry Flagg.

William H. Towle, Chicago, Ill. (Burke, Kerwin & Towle, Chicago, Ill. and Werner & Weiss, P. C., New York City, on the brief, Norman Weiss, New York City, of counsel),

for defendants-appellees American Warehousemen's Ass'n and The Intern. Ass'n of Refrigerated Warehouses, Inc.

Arnold H. Shaw, New York City (Jaffe, Shaw & Rosenberg, New York City, on the brief), for defendants-appellees Warehousemen's Ass'n of New York and New Jersey, Inc., and the Cold Storage Warehousemen's Ass'n of the Port of New York.

A. Seth Greenwald, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., State of New York, and Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for defendant-appellee Louis J. Lefkowitz, Atty. Gen. of the State of New York.

Before TIMBERS, Circuit Judge, and HOLDEN * and BRYAN,** District Judges.

FREDERICK van PELT BRYAN, Senior District Judge:

New York Uniform Commercial Code § 7–209 grants a warehouseman a lien upon goods in his possession for charges incurred in connection with storage, and permits him to retain the goods until such charges are satisfied. New York Uniform Commercial Code § 7–210 gives the warehouseman the power to enforce his lien by selling the stored goods, after complying with specified procedures.[1] This statute provides that notice of a prospective sale be given to the

* James S. Holden, Chief Judge of the District of Vermont, sitting by designation.

** Frederick van Pelt Bryan, Senior District Judge of the Southern District of New York, sitting by designation.

1. The full text of the statutes in question follows:

§ 7—209. *Lien of Warehouseman*

(1) A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation (including demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law. If the person on whose account the goods are held is liable for like charges or expenses in relation to other goods whenever deposited and it is stated in the receipt that a lien is claimed for charges and expenses in relation to other goods, the warehouseman also has a lien against him for such charges and expenses whether or not the other goods have been delivered by the warehouseman. But against a person to whom a negotiable warehouse receipt is duly negotiated a warehouseman's lien is limited to charges in an amount or at a rate specified on the receipt or if no charges are so specified then to a reasonable charge for storage of the goods covered by the receipt subsequent to the date of the receipt.

(2) The warehouseman may also reserve a security interest against the bailor for a maximum amount specified on the receipt for charges other than those specified in subsection (1), such as for money advanced and interest. Such a security interest is governed by the Article on Secured Transactions (Article 9).

(3) A warehouseman's lien for charges and expenses under subsection (1) or a security interest under subsection (2) is also effective against any person who so entrusted the bailor with possession of the goods that a pledge of them by him to a good faith purchaser for value would have been valid but is not effective against a person as to whom the document confers no right in the goods covered by it under section 7—503.

(4) A warehouseman loses his lien on any goods which he voluntarily delivers or which he unjustifiably refuses to deliver.

§ 7—210. *Enforcement of Warehouseman's Lien*

(1) Except as provided in subsection (2), a warehouseman's lien may be enforced by public or private sale of the goods in bloc or in parcels, at any time or place and on any terms which are commercially reasonable, after notifying all persons known to claim an interest in the goods. Such notification must include a statement of the amount due, the nature of the proposed sale and the time and place of any public sale. The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the warehouseman is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the warehouseman either sells the goods in the usual manner in any recognized market therefor, or if he sells at the price current in such market at the time of his sale, or if he has otherwise sold in conformity with commercially reasonable practices among dealers in the type of goods sold, he has sold in a commercially reasonable manner. A sale of more goods than apparently necessary to be offered to insure satisfaction of the obligation is not commercially reasonable except in cases covered by the preceding sentence.

owner of the stored goods. It does not, however, contemplate any judicial determination of the amount owing prior to the sale of the goods in satisfaction of the warehouseman's charges.

■ The question presented by this appeal is whether the warehouseman's enforcement of his lien in this manner constitutes action "under color of" state law within the meaning of 42 U.S.C. § 1983 or state action under the fourteenth amendment.[2] We hold that it does, and therefore reverse the lower court's dismissal of the complaint and remand for a determination of whether the statutory scheme involved comports with due process.

> (2) A warehouseman's lien on goods other than goods stored by a merchant in the course of his business may be enforced only as follows:
> (a) All persons known to claim an interest in the goods must be notified.
> (b) The notification must be delivered in person or sent by registered or certified letter to the last known address of any person to be notified.
> (c) The notification must include an itemized statement of the claim, a description of the goods subject to the lien, a demand for payment within a specified time not less than ten days after receipt of the notification, and a conspicuous statement that unless the claim is paid within that time the goods will be advertised for sale and sold by auction at a specified time and place.
> (d) The sale must conform to the terms of the notification.
> (e) The sale must be held at the nearest suitable place to that where the goods are held or stored.
> (f) After the expiration of the time given in the notification, an advertisement of the sale must be published once a week for two weeks consecutively in a newspaper of general circulation where the sale is to be held. The advertisement must include a description of the goods, the name of the person on whose account they are being held, and the time and place of the sale. The sale must take place at least fifteen days after the first publication. If there is no newspaper of general circulation where the sale is to be held, the advertisement must be posted at least ten days before the sale in not less than six conspicuous places in the neighborhood of the proposed sale.
> (3) Before any sale pursuant to this section any person claiming a right in the goods may pay the amount necessary to satisfy the lien

## I.

Since the case comes before us on the dismissal of the complaint, we accept the plaintiffs' allegations of fact as true. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The original plaintiff in this case, Shirley Herriott Brooks, was a resident of Mount Vernon. On June 13, 1973, pursuant to an order of eviction of the City Court of Mount Vernon, the city marshal removed Brooks and her possessions from her apartment. Brooks told the marshal that she wanted to call someone to store her furniture and other household goods. The marshal informed her that she could not do so and

> and the reasonable expenses incurred under this section. In that event the goods must not be sold, but must be retained by the warehouseman subject to the terms of the receipt and this Article.
> (4) The warehouseman may buy at any public sale pursuant to this section.
> (5) A purchaser in good faith of goods sold to enforce a warehouseman's lien takes the goods free of any rights of persons against whom the lien was valid, despite noncompliance by the warehouseman with the requirements of this section.
> (6) The warehouseman may satisfy his lien from the proceeds of any sale pursuant to this section but must hold the balance, if any, for delivery on demand to any person to whom he would have been bound to deliver the goods.
> (7) The rights provided by this section shall be in addition to all other rights allowed by law to a creditor against his debtor.
> (8) Where a lien is on goods stored by a merchant in the course of his business the lien may be enforced in accordance with either subsection (1) or (2).
> (9) The warehouseman is liable for damages caused by failure to comply with the requirements for sale under this section and in case of willful violation is liable for conversion.

2. The "under color of" state law provision in § 1983 is equivalent to the state action requirement of the fourteenth amendment. *Shirley v. State National Bank of Connecticut,* 493 F.2d 739, 741 (2d Cir.), *cert. denied,* 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974), citing *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 152 n. 7, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *United States v. Price,* 383 U.S. 787, 794–95 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

that the man with him, defendant Henry Flagg, president of defendant Flagg Brothers, Inc., would store her furniture. Flagg told Brooks that she would have to pay $65 per month for the moving and storage of her furniture. Brooks replied that this sounded like a high price but, believing that she had no choice, authorized Flagg to proceed with the moving and storage of her furniture and household possessions.

As soon as her goods were loaded on Flagg's trucks, one of the moving men told Brooks that she would have to pay $178–$75 per month for storage, $75 for barreling and platforming, and $28 for fumigating. Brooks protested that the entire job was only to cost $65, but eventually handed over a check for $178.

On or about June 15, 1973, Brooks called Flagg Brothers to find out how long it would store her goods for the $178 payment. She was informed that she already owed an additional $156. On June 19, 1973, Brooks went to the Flagg Brothers office. She was given a "Combined Uniform Household Goods Bill of Lading and Freight Bill" indicating that Flagg Brothers regarded the $178 payment as a deposit and that there was a "balance due" of $156.[3] Brooks told Henry Flagg that the charges were unreasonable and that she could not pay them. He told her that on the first of July, 1973, she would owe an

additional $75 for storage for the month of July. Brooks argued that her storage payment on June 13, 1973 should run to July 13, 1973, but Flagg insisted that, since storage charges are computed on a "per month" basis, even if her goods had been stored on June 29, 1973 an additional $75 would still be due on July 1, 1973.

The dispute over storage charges continued. On August 25, 1973, Brooks received a letter from Flagg Brothers informing her that unless she paid her outstanding balance of $306 within 10 days, her furniture would go up for sale. This letter was accompanied by a "Final Notice" informing Brooks that, unless payment on her storage account were made, Flagg Brothers would advertise her goods for public auction.

On September 21, 1973, Brooks instituted this action on behalf of herself and a proposed class consisting of

> persons whose property is stored in a warehouse located in the State of New York and whose property has been encumbered by a lien pursuant to New York Uniform Commercial Code § 7–209 and subject to sale pursuant to New York Uniform Commercial Code § 7–210 because of warehouse fees allegedly due, without opportunity for a prior hearing.

Relying upon 42 U.S.C. § 1983[4] and its jurisdictional counterpart, 28 U.S.C. § 1343(3),[5] she sought injunctive and declar-

---

**3.** We reject Flagg Brothers' assertion that Brooks agreed to sale upon default in payment by accepting, some six days after the initial storage, the "Combined Uniform Household Goods Bill of Lading and Freight Bill" which in minute print referred to sale by the warehouseman in the event of nonpayment of storage charges. *See Fuentes v. Shevin*, 407 U.S. 67, 94–96, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). We thus view the authorization of sale of stored goods by Flagg as arising solely from § 7–210, specifically subsection (2) which governs enforcement of a warehouseman's lien on goods other than goods stored by a merchant in the course of his business, and not from any contractual provisions. This is undoubtedly the case with respect to plaintiff Jones, who alleges that she never authorized storage of her goods, *see infra* at 768. The court below adopted this analysis, at least in part.

**4.** 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**5.** 28 U.S.C. § 1343 provides:

> The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
>
> . . . . .
>
> (3) To redress the deprivation under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all

atory relief and damages on the ground that the detention and threatened sale of her goods pursuant to New York Uniform Commercial Code §§ 7–209 and 7–210 violated the due process clause of the fourteenth amendment. Named as defendants were the Mount Vernon marshal,[6] Henry Flagg, and Flagg Brothers, Inc., individually and as representative of a proposed defendant class consisting of

> warehousemen doing business in the State of New York and who impose liens and subject goods to sale pursuant to New York Uniform Commercial Code §§ 209–210 [sic] without affording the owner of the goods a prior opportunity to be heard.

In accordance with an agreement between counsel, on January 24, 1974, subsequent to the filing of the complaint, Brooks was permitted to remove her possessions from Flagg Brothers' warehouse without paying the disputed storage charges. Then in February, 1974 counsel stipulated that the action, with the classes described substantially as above, was a proper plaintiff and defendant class action under Fed.R. Civ.P. 23 with respect to the claims for injunctive and declaratory relief. These stipulations, however, were never approved

by then District Judge Gurfein, to whom the case was assigned.

■ On June 25, 1974, Judge Gurfein granted the motion of Gloria Jones to intervene as party plaintiff pursuant to Fed.R. Civ.P. 24. Jones' allegations were parallel to those of Brooks. She, too, had been evicted by the Mount Vernon marshal, who was accompanied by an employee of Flagg Brothers. Jones denies, however, that she ever authorized Flagg Brothers to store her goods "either by written or oral contract, or otherwise," and claims that she was never advised of the rate she would have to pay for the storage of her household belongings. At the time of her proposed intervention, Jones' goods were still being retained by Flagg Brothers, who informed her counsel that they had no present intention to sell the goods and would inform him well in advance if they did decide to sell them.[7]

By the same order that granted Jones' motion to intervene, Judge Gurfein permitted the Attorney General of the State of New York, the American Warehousemen's Association, the International Association of Refrigerated Warehouses, Inc., the Warehousemen's Association of the Port of New York, Inc.,[8] and the Cold Storage Warehousemen's Association of the Port of

---

persons within the jurisdiction of the United States.

**6.** The action was subsequently dismissed as to the marshal by agreement of the parties.

**7.** It appears that after the district court rendered its decision of July 7, 1975 dismissing the complaint, see infra at 769, Mrs. Jones informed her counsel that she had paid Flagg $1,600 for the return of her goods; that she did not receive all of her goods back; that some of her goods were received in damaged condition; and that she did not make the $1,600 payment voluntarily but only because of alleged threats of sale and the twenty-month detention of the goods.

Thereafter, by letter dated December 15, 1976, while this appeal was sub judice, Jones' counsel informed the court pursuant to Fed.R. App.P. 43 that he had learned of her recent death.

It is well settled that a plaintiff's cause of action under 42 U.S.C. § 1983 survives for the benefit of the estate if the applicable state law

creates a right of survival. Spence v. Staras, 507 F.2d 554, 557 (7th Cir. 1974); Hall v. Wooten, 506 F.2d 564 (6th Cir. 1974); Brazier v. Cherry, 293 F.2d 401 (5th Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961). See also Shaw v. Garrison, 545 F.2d 980 (5th Cir. 1977) (§ 1983 claim survives plaintiff's death after suit was brought even though it would abate under applicable state law). Jones' claims for relief would survive under New York Estates, Powers and Trusts Law §§ 11–3.1, 3.2(b), and thus are not abated by her death for purposes of this suit. Accordingly, counsel for Jones requests that, in the event of reversal, the case be remanded to the district court with leave for substitution of her personal representative pursuant to Fed.R.Civ.P. 25(a).

**8.** The Warehousemen's Association of the Port of New York, Inc., subsequently amended its certificate of incorporation to change its name to "Warehousemen's Association of New York and New Jersey, Inc."

New York to intervene as parties defendant. *Brooks v. Flagg Brothers, Inc.,* 63 F.R.D. 409 (S.D.N.Y.1974). The Attorney General was allowed to intervene on consent. Judge Gurfein permitted the trade associations to intervene over the objection of plaintiffs' counsel. The associations claimed that their members were engaged in large scale warehousing on behalf of merchants and other commercial entities functioning in interstate commerce, and argued that their interests in upholding the constitutionality of §§ 7–209 and 7–210 would not be adequately represented by Flagg Brothers, whose business was the moving and storage of furniture and other household goods.

On August 26, 1974, plaintiffs moved for class certification as to both plaintiffs and defendants, and for summary judgment on the question of the constitutionality of §§ 7–209 and 7–210. On September 19, 1974, the Flagg defendants moved to dismiss the action for failure to state a claim upon which relief can be granted.

By decision and order dated July 7, 1975, Judge Werker, to whom the case had been reassigned, denied plaintiffs' motion for summary judgment and granted defendants' motion to dismiss the complaint. Applying the analysis of *Jackson v. Statler Foundation,* 496 F.2d 623 (2d Cir. 1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975),[9] Judge Werker concluded that in imposing and enforcing his lien pursuant to §§ 7–209 and 7–210, the warehouseman does not act "under color of" state law within the meaning of 42 U.S.C. § 1983. He dismissed the action for failure to state a claim under 42 U.S.C. § 1983 without passing upon the due process claims

or the class certification questions. This appeal followed.

Appellants do not presently press their challenges to § 7–209, which authorizes imposition of the warehouseman's lien and retention of stored goods until it is satisfied.[10] They do, however, contend that enforcement of the warehouseman's lien by sale pursuant to § 7–210 constitutes state action because the statute (1) delegates to the warehouseman uniquely governmental power and (2) expands the remedies available to the warehouseman beyond those which he possessed at common law. On the present record, this question is properly before us for decision. *See Tedeschi v. Blackwood,* 410 F.Supp. 34, 38–41 (D.Conn.1976) (three-judge court) and cases there cited. *See also Franks v. Bowman Transportation Co.,* 424 U.S. 747, 752–57, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

## II.

The state action inquiry is not an easy one. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). The ultimate question to be resolved is "whether there is a sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).

9. In *Jackson,* Judge Smith specified five factors that are "particularly important" to a determination of state action:

(1) the degree to which the "private" organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a

public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a "private" organization in associational or other constitutional terms.

Each of these factors is material; no one factor is conclusive.

496 F.2d at 629.

10. However, they state that they wish to preserve this point for possible review by the Supreme Court.

The first step in the resolution of this question is to identify correctly the particular kind of state action allegation with which the court is dealing. This is because standards for determining state action have been formulated in many different contexts, and the resulting formulations are not often interchangeable. For example, the criteria for finding state action in equal protection cases involving charges of racial discrimination are easier to meet than those formulated in cases such as that at bar. *See, e. g., Coleman v. Wagner College*, 429 F.2d 1120, 1127 (2d Cir. 1970) (Friendly, J., concurring); *Jackson v. Statler Foundation, supra*, at 628–29; *Girard v. 94th St. and Fifth Ave. Corp.*, 530 F.2d 66, 69 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976). Similarly, tests for determining whether the state has become so entwined with a private entity—by financially supporting it, regulating it, or otherwise—as to make the actions of the private entity the state's own, are not of much help in resolving other types of state action problems.

In this case, Judge Werker used the factors enumerated in *Jackson v. Statler Foundation, supra*, at 629, *see supra* n. 9, to determine whether state action was present. The *Jackson* factors, however, developed in a case where the appellant sought to characterize the allegedly racially discriminatory activities of certain private foundations as state action by virtue of the foundations' tax exempt status, are not particularly enlightening when applied to the factual situation at hand. The instant case involves a question of alleged delegation of distinctly governmental power, which can best be resolved by reference to cases involving similar facts.

The Supreme Court has not yet squarely addressed the question of whether a delegation of state authority to creditors constitutes state action. Its only comment on the subject came in *Jackson v. Metropolitan Edison Co., supra,* where the Court rejected a claim that state action was present in a tariff-authorized termination of electric service by a privately owned and operated utility corporation holding a certificate of public convenience issued by the Pennsylvania Utility Commission. The Court there noted:

> If we were dealing with the exercise by [the power company] of some power delegated to it by the State which is traditionally associated with sovereignty . . . our case would be quite a different one.

419 U.S. at 352–53, 95 S.Ct. at 454.

Several circuit courts, however, have decided the state action question in cases involving due process challenges to summary creditors' remedies similar to that presented here. These cases have focused on essentially the same factors (whether the state has delegated one of its unique powers to a private person; whether the common law rights of the creditor were expanded or merely codified; whether the creditor's power amounts to a roving commission or exists only over particular chattels that are closely connected with the debt; whether the creditor's remedy was authorized by contract as well as statute; whether the creditor's resort to the remedy was mandatory or optional; whether the state extensively regulates the creditor's industry; and even whether title rests in the debtor or creditor) to varying degrees and with varying results. *See Culbertson v. Leland*, 528 F.2d 426 (9th Cir. 1975) ("innkeeper's" lien; state action); *Hall v. Garson*, 430 F.2d 430 (5th Cir. 1970) ("innkeeper's" lien; state action); *Davis v. Richmond*, 512 F.2d 201 (1st Cir. 1975) ("innkeeper's" lien; no state action); *Anastasia v. Cosmopolitan National Bank of Chicago*, 527 F.2d 150 (7th Cir. 1975), *cert. denied*, 424 U.S. 928, 96 S.Ct. 1143, 47 L.Ed.2d 338 (1976) ("innkeeper's" lien; no state action); *Philips v. Money*, 503 F.2d 990 (7th Cir. 1974), *cert. denied*, 420 U.S. 934, 95 S.Ct. 1141, 43 L.Ed.2d 409 (1975) ("garageman's" lien; no state action); *James v. Pinnix*, 495 F.2d 206 (5th Cir. 1974) (repossession; no state action); *Adams v. Southern California First National Bank*, 492 F.2d 324 (9th Cir.), *cert. denied*, 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974) (repossession; no state action); *Fletcher v. Rhode Island Hospital Trust Na-*

*tional Bank*, 496 F.2d 927 (1st Cir.), *cert. denied*, 419 U.S. 1001, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974) (bank's right of set-off; no state action); *Melara v. Kennedy*, 541 F.2d 802 (9th Cir. 1976) (enforcement of warehouseman's lien under California Commercial Code § 7210; no state action).

■ Appellants here specify only two factors which point to state action in the warehouseman's enforcement of his lien. We conclude, however, that the combination of New York's statutory delegation of distinctly governmental power to the warehouseman and its corresponding expansion of his common law remedies suffices to thrust the state's involvement in the challenged activity over the threshold of state action.

New York Uniform Commercial Code § 7–210 provides the warehouseman with a truly extraordinary remedy. After giving the bailor specified notice, *see supra* n. 1, the warehouseman is entitled to sell the stored goods in satisfaction of whatever he determines the storage charges to be. The warehouseman, unquestionably an interested party, is thus authorized by law to resolve any disputes over storage charges finally and unilaterally.

The Supreme Court has already shown its grave concern over even temporary deprivations of property without prior judicial determination of the amount owing in a series of cases challenging various provisional remedies afforded creditors. *See Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Fuentes v. Shevin, supra; Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). These cases stand at least for the proposition that while judicial inquiry may at times be postponed, an adequate judicial determination of liability must take place before any deprivation of property if due process requirements are to be satisfied. The statutory scheme before us, in contrast, contemplates no judicial—or even impartial—determination of the amount owing before a final deprivation of property.

This would be quite beside the point if the state were not implicated in the warehouseman's enforcement of his lien. But by enacting § 7–210, New York not only delegated to the warehouseman a portion of its sovereign monopoly power over binding conflict resolution, *see Shirley v. State National Bank of Connecticut, supra*, at 747 (Kaufman, C. J., dissenting); *Bond v. Dentzer*, 494 F.2d 302, 312 (2d Cir.), *cert. denied*, 419 U.S. 837, 95 S.Ct. 65, 42 L.Ed.2d 63 (1974) (Kaufman, C. J., dissenting), but also let him, by selling stored goods, execute a lien and thus perform a function which has traditionally been that of the sheriff.[11]

This delegation expanded the warehouseman's remedies far beyond those existing at common law. There the warehouseman, in the absence of an express agreement authorizing sale upon default, could only retain the goods to coerce payment; he could not

---

11. *Blye v. Globe-Wernicke Realty Co.*, 33 N.Y.2d 15, 347 N.Y.S.2d 170, 300 N.E.2d 710 (1973). There, in finding that an innkeeper's enforcement of his lien pursuant to New York Lien Law § 181 involves state action and violates due process, the New York Court of Appeals stated:

> In this State, the execution of a lien, be it a conventional security interest (Lien Law, § 207), a writ of attachment (CPLR art. 62), or a judgment lien (CPLR art. 52) traditionally has been the function of the Sheriff.

347 N.Y.S.2d at 175, 300 N.E.2d at 713. *See also Sharrock v. Dell Buick-Cadillac, Inc.*, 393 N.Y.S.2d 166 (App.Div.1977).

We do not agree with Judge Werker's attempt to distinguish *Blye* on the ground that the liens referred to there all involve execution upon goods having no particular relationship to the debt owing. A "conventional security interest" would include the typical purchase money security interest where the debt and security are fundamentally related.

Moreover, we are reluctant to rely heavily in the state action inquiry upon whether the property executed upon is closely connected to the alleged debt or not connected at all. This consideration bears only upon the extent of the intrusion upon the debtor's property rights that the state has authorized, and not upon whether the state has in fact delegated some of its sovereign power.

sell the goods and apply the proceeds to the debt. R. Brown, The Law of Personal Property § 108, at 519, § 119, at 588–89 (2d ed. 1955).[12] If mere detention of the goods failed to bring about payment, the warehouseman had to resort to the courts to obtain a judgment for the charges due and then deliver a writ of execution to the sheriff, who would sell the goods pursuant to the requirements of state law and deliver the proceeds to the warehouseman. *See* 62 N.Y.Jur. *Warehouse Receipts* § 125, at 747, 747 n. 2. Only in 1879 [13] did the warehouseman for the first time become empowered to sell stored goods in satisfaction of delinquent charges.[14]

Appellees argue that the alteration of common law rights which took place is of little significance, citing the following passage from Burke and Reber, *State Action, Congressional Power and Creditors' Rights: An Essay on the Fourteenth Amendment,* 47 S.Cal.L.Rev. 1 (1973):

> The fact that the law under attack is new and creates, rather than codifies, common law rights should not change the inquiry. The focus for state action purposes should always be on the impact of the law upon private ordering, not the law's age or historical underpinnings. Unless the law in some fashion significantly interferes with private ordering, the challenged conduct should not be attributed to the state. To make state action turn upon whether the statutory right being asserted has common law origins would lead to anomalous results. The identical private conduct pursuant to the identical state statutory or judicial law, would be state action in some states while not in others depending solely upon the fortuitous and unimportant circumstance of the age and history of the law.
> *Id.* at 47.

We of course agree that an alteration in the common law remedy alone is not dispositive of the state action inquiry. But we reject the authors' conclusion that statutes such as § 7–210 have only a minor impact on "private ordering."

Were it not for this statute, the warehouseman would stand in the position of any other creditor, i. e., he would have to have the debt he claims he is owed judicially established, and then have the sheriff execute upon the goods which he concededly has the common law right to hold as security. The action of the state in granting the warehouseman the privileged position he enjoys under § 7–210, even though long ago, drastically changes the balance of power between debtor and creditor. It permits a complete circumvention of the judicial process, by installing the warehouseman as the final and interested judge of any disputes over storage charges, and as the sheriff who will enforce his own decisions. While we recognize generally the value of preserving a sphere for private activity free from the restrictions imposed upon the state by the fourteenth amendment,[15] it is plain that the state's conscious election to delegate a portion of its uniquely governmental power to the warehouseman in order to enhance his common law position as creditor constitutes state action.

The result we reach today accords with prior decisions of this circuit which conducted similar state action inquiries.

In *Shirley v. State National Bank of Connecticut, supra,* the plaintiff's automobile was peacefully repossessed by an assignee

---

**12.** *See also Schmidt v. Blood,* 9 Wend. 268, 271 (N.Y.Sup.Ct.1832); *Knapp, Stout & Co. v. McCaffrey,* 177 U.S. 638, 644–45, 20 S.Ct. 824, 44 L.Ed. 921 (1900).

**13.** We note in passing that this was subsequent to the enactment of the fourteenth amendment.

**14.** *See* Ch. 336, [1879] N.Y. Laws 417. This statute underwent various amendments and re-enactments, not here pertinent, before assuming its present form with the adoption of the Uniform Commercial Code in 1962. *See* Ch. 421, [1883] N.Y. Laws 592; Ch. 526, [1885] N.Y. Laws 891; Ch. 418, [1897] N.Y. Laws 514; Ch. 369, [1899] N.Y. Laws 793; Ch. 732, [1907] N.Y. Laws 1706; Ch. 588, [1949], N.Y. Laws 1339.

**15.** This value is nonexistent, however, when a private party wields power that belongs to the state and is subject to egregious abuse if not regulated.

of the conditional seller, pursuant to a contractual provision. The plaintiff challenged the constitutionality of the Connecticut statute which authorizes such repossession if the sales contract expressly makes default a ground for retaking the property. In concluding that state action was not present, the court, with Chief Judge Kaufman dissenting, relied heavily on the fact that Connecticut creditors had a common law right to peaceful repossession without a hearing, and that the statutory enactment only increased protection of installment purchasers. Judge Mulligan reasoned that

> since peaceful repossession existed at common law in Connecticut, the mere codification of that right does not, in our view, constitute state action. No delegation of traditional state power has been granted to any private person.

493 F.2d at 743.

In *Bond v. Dentzer, supra,* the same panel which decided *Shirley* faced a similar question: whether the unilateral filing of wage assignments by creditors with their debtors' employers, as authorized by the New York wage assignment statute and pursuant to specific loan agreements, constitutes state action. Once again the court, with Chief Judge Kaufman dissenting, found no state action, rejecting the plaintiffs' "partnership," "encouragement," and "traditional state functions" theories. The partnership argument fell because of the lack of state "entwinement" with the defendant finance companies. The other arguments failed because the state had "not deprived the plaintiffs of anything," 494 F.2d at 307:

> [T]he legislation does not vest the assignee with any function traditionally performed by the State. The function of the wage assignment has always been that of a private levy without a prior court order. There was never any requirement or practice which has been called to our attention which mandated the creditor to first establish the debt before attaching the wages and which the State has now

abrogated. In fact, as our prior discussion indicates, the State has created a right on the part of the debtor to question the debt by initiating an action which was not known at common law. In sum, the statute has not given the assignee anything new; it has in fact circumscribed substantially the rights of the creditor which were untrammeled at common law.

494 F.2d at 311.

The distinctions between the facts of *Shirley* and *Bond* and those of the case at bar are manifest. In neither of those cases was there any expansion of common law creditors' remedies or delegation of power traditionally exercised by the state—the precise factors which we deem determinative in the present state action inquiry.[16] *See also Tedeschi v. Blackwood, supra,* at 42 n.10.

In the most recent case on the subject in this circuit, *Tedeschi v. Blackwood, supra,* Judge Smith, writing for a three-judge district court in Connecticut, concluded that statutory provisions permitting the foreclosure by sale of a garageman's lien for towing and storage—analogous to § 7–210—involved state action and violated due process.

The statutory scheme at issue in *Tedeschi* empowered a police officer or motor vehicle inspector who determined that a motor vehicle had been abandoned, unregistered, or dangerously parked to have the vehicle towed to a garage for storage. All towing and storage charges incurred became a lien on the vehicle which in time could be foreclosed by the garage through its sale of the vehicle. The statute did not, however, afford a right to a hearing to a person wishing to contest the application of either its towing or its lien provisions to his vehicle.

Judge Smith found state action present in the implementation of the towing provisions by virtue of a state agent's "meaningful participation" by initiating all such towings. He then ruled that state action was

---

**16.** A further distinguishing feature of both *Shirley* and *Bond* is that the courts there concluded that the creditors' remedies in question were specifically authorized by contracts underlying the debts. Contrast n.3, *supra.*

present in the creation of the garageman's lien because, rather than merely "acknowledging" the legality of private conduct, this statute "authorized" conduct which would otherwise be impermissible.[17] Finally, he concluded that

> taken *by itself*, the foreclosure of a garagekeeper's lien pursuant to § 14–150 to cover towing and storage charges also constitutes "state action," [18]

410 F.Supp. at 42 (emphasis added), and noted that in *Hernandez v. European Auto Collision*, 487 F.2d 378 (2d Cir. 1973), this court gave a strong indication that it would find such foreclosure or sale provisions unconstitutional.

The plaintiff in *Hernandez*, whose car was auctioned off by a garageman after he refused to pay for allegedly unauthorized repairs, challenged the pertinent sale provision of the New York Lien Law. Without expressly addressing the issue of state action, the court, in an opinion by Judge Wyzanski, ruled that, if the facts were as plaintiff claimed, he had a tenable contention that the lien law as applied violated the due process clause. It directed the district court to try the case on its merits. Judge Timbers, in a concurring opinion joined by Judge Lumbard, would have taken the further step of directing the district court to declare the sale provisions unconstitutional as applied if Hernandez were able to prove his allegations. 487 F.2d at 383.

Appellants here argue that state action was found *sub silentio* by the *Hernandez* court, and point out that the plaintiff in that case briefed the point on appeal. While such a *sub silentio* jurisdictional ruling is not binding precedent in this court,

*United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38, 73 S.Ct. 67, 97 L.Ed. 54 (1952), we note Chief Judge Kaufman's dissent in *Shirley v. State National Bank of Connecticut, supra*, at 745–47, particularly his statement that the garageman's right of sale at issue in *Hernandez* did not exist at common law. *See also Sharrock v. Dell Buick-Cadillac, Inc., supra*.

We recognize that our holding that the enforcement of the warehouseman's lien pursuant to § 7–210 constitutes action under color of state law is directly contrary to that of the Ninth Circuit in *Melara v. Kennedy, supra*. We have given that case due consideration, but we disagree with its conclusion and are unpersuaded by its analysis.

The case is reversed and remanded to the district court. On remand, the first question to be resolved is that of class determination,[19] because that may have an important bearing on the resolution of due process claims. Since the named plaintiffs in this case were consumers who stored personal belongings with Flagg Brothers and not merchants, the only constitutional challenge they can make individually is to § 7–210(2), which authorizes enforcement of the warehouseman's lien upon goods "other than goods stored by a merchant in the course of his business." § 7–210(1) is an entirely distinct provision which authorizes enforcement of the warehouseman's lien in the typical commercial warehousing situation, and defendant trade associations have raised a serious argument that a summary sale provision in this context may be constitutionally unobjectionable. *See D. H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972). The constitu-

---

**17.** Judge Smith observed:

> While Connecticut common law may recognize the legality of a garage lien for services on a vehicle voluntarily surrendered for the performance of these services, it does not recognize such a lien where the garage has gained possession of the vehicle without the owner's consent. *See Paton v. Robinson*, 81 Conn. 547, 554, 71 A. 730 (1909).

410 F.Supp. at 42.

**18.** Judge Smith may have qualified this conclusion somewhat when he observed later in his opinion:

> Thus, even if, when considered by itself, the implementation of the lien provisions did not result in "state action", it would still be infected by the "state action" resulting from the implementation of § 14–150's towing provision.

410 F.Supp. at 43.

**19.** Leave is hereby granted for substitution of Jones' personal representative as plaintiff pursuant to Fed.R.Civ.P. 25(a). *See n.7 supra*.

tionality of § 7–210(1) will not be before the court, however, unless commercial warehouses are determined to be within a defendant class against which suit is brought by an appropriate class of plaintiffs.

Reversed and remanded.

HOLDEN, District Judge, dissenting:

I respectfully dissent. I am persuaded, as Judge Werker was, that his court was without jurisdiction and would affirm the dismissal of the action.

The unfortunate plight which confronted the plaintiff Brooks, following her eviction in June 1973, inspires concern. And Mrs. Jones was similarly situated when she was evicted in November of the same year. According to the complaints they were victimized by the overbearing of the defendant warehouseman. But on the facts alleged the State of New York was not a participant in the action taken by the defendant Flagg.

The defendant retained the bailed property under an ancient possessory lien conferred by the common law.[1] See Schmidt v. Blood, 9 Wend. 268, 271 (N.Y.Sup.Ct.1832); cf. Knapp, Stout & Co. v. McCaffrey, 177 U.S. 638, 644–645, 20 S.Ct. 824, 44 L.Ed. 921 (1900). See also R. Whitaker, A Treatise of the Law Relative to the Rights of Lien and Stoppage in Transitu 13–14 (1816). While the complaints speak of threats of sale, that drastic remedy was not applied; the property has been returned to both plaintiffs.[2]

The power of sale asserted by the defendant was first conferred on warehousemen by an enactment of the New York Legislature in 1879. Ch. 336 [1879] N.Y. Laws 417. Thus, for nearly a century warehousemen in New York have had the authority to sell goods stored with them to satisfy delinquent charges. The majority of the court concludes that the "statutory delegation of government power and its corresponding expansion of his common law remedies suffices to thrust the state's involvement, in the challenged activity over the threshold of state action." According to the majority, that thrust is sufficient to generate the judicial power to uproot a statutory provision that has governed the rights and remedies between warehousemen and their bailors for many years without interdiction by the courts of New York.

I agree that the question to be searched is whether the State of New York has become so involved in the retention and threatened sale of the plaintiff's goods that defendant's action "may be fairly treated as that of the State itself." Jackson v. Metropolitan Edison Co., supra, 419 U.S. at 351, 95 S.Ct. at 453. Without such participation the Fourteenth Amendment affords no protection. Id.

Of course a state can act only by way of its legislative, executive and judicial branches. Ex parte Virginia, 100 U.S. 339, 347, 25 L.Ed. 676 (1880). Here there is no suggestion of state participation by judicial action. To the contrary, it is the want of judicial action that is the predicate of the complaint. And the State's executive officers were not participants in either the creation of the lien or the threat to enforce it. The State quit the arena when the evictions were accomplished, before the present controversy began. The only state involvement is through the action of the legislature in adopting the challenged provisions of the Uniform Commercial Code § 7–210.

The question, as I perceive it, is whether the remedies provided by §§ 7–209 and 7–210 of the New York Uniform Commercial Code are "commanded" by the State, or "so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action."

1. The common law remedy in New York gave the warehouseman a possessory lien on the stored goods until the storage charges were paid.

2. After the action was brought, by agreement of counsel, the plaintiff Brooks removed her goods without paying the storage charges. The plaintiff Jones' storage charges were paid with protest against the amount of the charges and the goods were removed.

*Evans v. Newton,* 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966).

The roots of the present controversy are embedded in private dealings between the warehouseman and the bailors of the property that was stored in the warehouse facility. No state agency or official has intervened to sell or threaten to sell the property entrusted by the plaintiffs to the defendant warehouseman. As to non-commercial storage, such as here involved, the Uniform Commercial Code merely retained the detailed provisions for notice, publication and public sale found in Section 33 of the Uniform Warehouse Receipts Act. Uniform Commercial Code § 7–210, Official Comment 1.

In *Shirley v. State National Bank,* 493 F.2d 739 (2d Cir.), *cert. denied,* 419 U.S. 1009, 95 S.Ct. 329, 42 L.Ed.2d 284 (1974), the court was concerned with state action in the context of the Connecticut Retail Installment Sales Financing Act. Writing for the majority, Judge Mulligan pointed out:

> Here the right to private repossession always existed. Codification did not encourage the practice one whit. As we have pointed out, the legislation made it less attractive by providing greater safeguards to the consumer in the conditional sales contract.

*Id.* at 744.

By the law of New York the enforcement of a warehouseman's lien, for nearly a hundred years, has not been the function of the sheriff. As will be seen from what is written in the margin, the historical background of the challenged statute tells us that the State of New York has not been significantly involved in the enforcement of the warehouseman's lien since 1879 unless, of course, either the bailor or bailee elected to resort to judicial action. And the statute makes no "command" that §§ 7–209 and 7–210 shall be pursued as the warehouseman's exclusive remedy. *Compare Peterson v. City of Greenville,* 373 U.S. 244, 248, 83 S.Ct. 1119, 10 L.Ed.2d 323 (1963). The statutory history of the contested provisions of the New York Uniform Commercial Code indicates that there has been an accretion

of safeguards to the mutual benefit of the parties to the bailment. *Cf. Bond v. Dentzer,* 494 F.2d 302, 307–09 (2d Cir.), *cert. denied,* 419 U.S. 837, 95 S.Ct. 65, 42 L.Ed.2d 63 (1974); *Shirley v. State National Bank, supra,* 493 F.2d at 742.

Resolution of the question of government action "hinges on the weighing of a number of variables, principally the degree of government involvement, the offensiveness of the conduct, and the value of preserving a private sector free from the constitutional requirements applicable to government institutions." *Wahba v. New York University,* 492 F.2d 96, 102 (2d Cir.), *cert. denied,* 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); Friendly, The Dartmouth College Case and the Public-Private Penumbra (1969).

Here we are not confronted with offensive discriminatory conduct by a private entity. There is nothing mandatory about the challenged statute; the State is neutral. The facts of the present controversy fail to establish involvement by the State of New York sufficient to constitute state action. *Bond v. Dentzer, supra.* See *Shirley v. State National Bank, supra,* 493 F.2d at 744.

Unlike the majority, I am persuaded that the adoption of § 7–210 of the New York Commercial Code does not constitute state action. The reasoning pursued in *Melara v. Kennedy,* 541 F.2d 802 (9th Cir. 1976) on the very question presented here, appears to me to be sound. *See also Smith v. Bekins Moving & Storage Co.,* 384 F.Supp. 1261 (E.D.Pa.1974).

As we have seen, New York Uniform Commercial Code §§ 7–209 and 7–210 afford a choice of remedies to both bailor and bailee. The defendant warehouseman's exercise, or threatened exercise, of the power of sale allowed by the Code, "where the initiative comes from it and not from the State, does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment." *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 357, 95 S.Ct. at 457.

Absent the jurisdictional requisite of state action, I would affirm the order of the

District Court without reaching the due process claim.